527 A.2d 332

Michael Anthony CHEW

v.

STATE of Maryland.

No. 1067, Sept. Term, 1986.

Court of Special Appeals of Maryland.

July 7, 1987.

682

Terrell N. Roberts, III (Douglas J. Wood on the brief), Langley Park, for appellant.

Jillyn K. Schulze, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, Warren F. Sengstack, State's Atty. for Calvert County and Stephen Clagett, Deputy State's Atty. for Calvert County on the brief, Prince Frederick, for appellee.

Argued before MOYLAN and BISHOP, JJ., and FRED A. THAYER, Judge of the Fourth Judicial Circuit, Specially Assigned.

MOYLAN, Judge.

### The Background

On July 28, 1868, the Fourteenth Amendment to the Constitution of the United States was ratified. The enduring part of that amendment has been its Section 1, which includes the three provisions that have come to be called 1) the privileges and immunities clause, 2) the due process clause, and 3) the equal protection clause. It is the equal

protection clause that concerns us here. It provides: "No State shall ... deny to any person within its jurisdiction the equal protection of the laws."

Within 12 years of ratification, the Supreme Court decided *Strauder v. West Virginia*, 100 U.S. (10 Otto) 303, 25 L.Ed. 664 (1880). That decision held that the State of West Virginia had denied a black defendant the equal protection of the laws when it put him on trial before a jury from which members of his race had been purposefully excluded. The mechanism of purposeful exclusion had been a state law prohibiting blacks from serving on juries generally. Such systematic and legislatively mandated discrimination presented an easy target for constitutional attack.

A knottier problem was presented when the mechanism for allegedly denying equal protection was not a blanket statute or rule of procedure but the discretionary use of the peremptory challenge. A further distinction contrasted a pattern of using peremptory challenges over a series of cases with the case-specific use of peremptory challenges in a single instance. The peremptory challenge, a venerable fixture of the common law, was the device by which any party to a lawsuit, civil or criminal, was permitted to strike a predetermined number of prospective jurors from the jury panel without any justification or explanation needing to be shown. Within the numerical limits of one's available peremptory challenges, the striking party was free to be as arbitrary, capricious, or irrational as he might choose in the exercise of those strikes. As the adjective "peremptory" implied, there could be no outside review of an option committed to the total discretion of the user. The rationale for the peremptory challenge is that participants in the jury selection process will frequently have hunches—feelings of hostility toward certain prospective jurors or feelings of empathy with other prospective jurors. These hunches are frequently based on "vibrations" or non-verbal communications that seldom can be articulated rationally. The canons of trial advocacy insist that skilled adversaries be permitted, within reasonable numerical limits, to act upon their

hunches and feelings. An article of faith in that jury selection is more an art form than a science.

Inevitably, the use of the peremptory strike, especially but not necessarily by the prosecutor in a criminal case, invited challenge under the equal protection clause. Just such a challenge was made in *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). The Supreme Court generally extolled the historic purpose and continuing value of the peremptory challenge, 380 U.S. at 218–222, 85 S.Ct. at 834–837. It observed, however, that the proper function of the challenge is to enhance the chance of victory in a single case and not to perpetuate a pattern of demographic exclusion in the community as a whole. It held that where there is shown to have been a systematic exclusion of blacks from petit juries generally, there has been demonstrated that "invidious discrimination" which is forbidden by the equal protection clause. Where prospective black jurors, for instance, were challenged even in those particular cases where their presence would probably enhance rather than diminish the State's likelihood of success, "the purposes of the peremptory challenge [were] being perverted," 380 U.S. at 224, 85 S.Ct. at 838, to preserve the "lily white" character of a community's court system rather than to win a victory in a specific case. The Supreme Court held that systematic use of the peremptory challenge to preserve, *de facto,* a segregated judicial system violated the equal protection clause.

Within the limited context of a single case, however, the Court held that inquiry was not permitted into the motives of the prosecutor for exercising peremptory strikes:

"In the light of the purpose of the peremptory system and the function it serves in a pluralistic society in connection with the institution of jury trial, we cannot hold that the Constitution requires an examination of the prosecutor's reasons for the exercise of his challenges in any given case. The presumption in any particular case must be that the prosecutor is using the State's challenges to obtain a fair and impartial jury to try the case

before the court. The presumption is not overcome and the prosecutor therefore subjected to examination by allegations that in the case at hand all Negroes were removed from the jury or that they were removed because they were Negroes. Any other result, we think, would establish a rule wholly at odds with the peremptory challenge system as we know it."

380 U.S. at 222, 85 S.Ct. at 837.

Maryland followed *Swain v. Alabama.* In *Brice v. State,* 264 Md. 352, 366, 286 A.2d 132 (1972), the Court of Appeals, after citing *Swain,* held:

"In short, the right to exercise the peremptory strike is unfettered and may be exercised by either party for any reason or indeed for no reason. Hunch, passing impression, appearance of the prospective juror, or any other consideration may lead to the exercise of the peremptory challenge and no inquiry may be made in regard to why it is exercised."

*See also Lawrence v. State,* 51 Md.App. 575, 444 A.2d 478 (1982), *aff'd, Lawrence v. State,* 295 Md. 557, 457 A.2d 1127 (1983); *Evans v. State,* 304 Md. 487, 522–528, 499 A.2d 1261 (1985). It was to be expected, therefore, that the trial judge in this case also followed *Swain.*

### The Present Case

The appellant, Michael Anthony Chew, was convicted by a Charles County jury, presided over by Judge George W. Bowling, of 1) first-degree felony-murder, 2) an attempt to commit rape in the first degree, and 3) a third-degree sexual offense. For the felony-murder, the appellant received a sentence of life imprisonment. The conviction for the attempted rape in the first degree was merged into the felony-murder conviction. For the third-degree sexual offense, the appellant received a sentence of ten years, to be served consecutively with the life sentence. Upon this appeal, the appellant raises the following six contentions:

1) That the use of peremptory challenges by the State to strike every member of the appellant's race from the

jury panel was a violation of his constitutional right to the equal protection of the law;

2) That he was denied his Fifth Amendment privilege against compelled self-incrimination when the prosecutor, in opening statement, made an adverse comment upon his probable invocation of his right to silence;

3) That the evidence was not legally sufficient to support the convictions for attempted rape in the first degree and the third-degree sexual offense;

4) That Judge Bowling erroneously denied his motion for the production of specimens of pubic hair by the State's chief prosecution witnesses;

5) That Judge Bowling erroneously restricted his cross-examination of a State's witness; and

6) That Judge Bowling erroneously excluded evidence necessary to the defense theory of the case.

### Batson v. Kentucky

On April 30, 1986, the Supreme Court decided *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). *Batson* overturned that portion of *Swain v. Alabama* that had foreclosed inquiry into the purpose for using peremptory challenges in a manner apparently racially motivated. It extended the equal protection inquiry to the context of an individual case, relieving the putative victim of the equal protection violation of the burden of showing a systematic pattern of abuse over a series of cases. It concluded, "To the extent that anything in *Swain v. Alabama* ... is contrary to the principles we articulate today, this decision is overruled." 476 U.S. at —— n. 25, 106 S.Ct. at 1725 n. 25, 90 L.Ed.2d at 90 n. 25.

### The Retroactivity Issue

*Batson v. Kentucky* was decided on April 30, 1986. The trial of the present case had concluded as of November 26, 1985. In the immediate wake of *Batson, Allen v. Hardy*, 478 U.S. ——, 106 S.Ct. 2878, 92 L.Ed.2d 199 (1986), held

that that decision, overruling *Swain v. Alabama,* would not be applied retroactively to cases on collateral federal *habeas corpus* review. *Griffith v. Kentucky,* 479 U.S. ——, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987), has since held, however, that the new rule of *Batson* will be applied to all cases still pending on direct review, and therefore not yet final, as of the date of the *Batson* decision. The present case falls into that "non-final" category and will, therefore, be analyzed under the standards of *Batson.*

## The Constitutional Predicate

In the interim between *Swain* and *Batson,* several jurisdictions concluded that the examination of the use of peremptory challenges in a racially discriminatory manner was reviewable even within the context of a single case. They distinguished *Swain* by pointing out that that decision was based exclusively upon the equal protection clause of the Fourteenth Amendment. They based their holdings, by way of contrast, on the Sixth Amendment right to an impartial jury. *People v. Wheeler,* 22 Cal.3d 258, 148 Cal.Rptr. 890, 583 P.2d 748 (1978); *Commonwealth v. Soares,* 377 Mass. 461, 387 N.E.2d 499 (1979); *Riley v. State,* 496 A.2d 997 (Del.1985); *State v. Neil,* 457 So.2d 481 (Fla.1984); *State v. Crespin,* 94 N.M. 486, 612 P.2d 716 (App.1980); *Booker v. Jabe,* 775 F.2d 762 (6th Cir.1985), *vacated sub. nom. Michigan v. Booker,* —— U.S. ——, 106 S.Ct. 3289, 92 L.Ed.2d 705, *aff'd,* 801 F.2d 871 (1986); *McCray v. Adams,* 750 F.2d 1113 (2d Cir.1984), *vacated,* —— U.S. ——, 106 S.Ct. 3289, 92 L.Ed.2d 705 (1986). The petitioner Batson actually based his claim on the Sixth Amendment right to an impartial jury. The Supreme Court, however, rested its decision in *Batson* exclusively on the equal protection clause.[1] The Court stated unequivocally,

---

**1.** A heated controversy developed between the concurring opinion of Justice Stevens (joined by Justice Brennan) and the dissenting opinion of Chief Justice Burger (joined by Justice Rehnquist) over the propriety of basing an important constitutional decision, and overruling the long-standing precedent of *Swain v. Alabama,* on a constitutional

at 476 U.S. at —— n. 4, 106 S.Ct. at 1716 n. 4, 90 L.Ed.2d 79 n. 4:

> "We agree with the State that resolution of petitioner's claim properly turns on application of equal protection principles and express no view on the merits of any of petitioner's Sixth Amendment arguments."

Although the ultimate reach of *Batson* still lies shrouded in an unseen future, its choice of a constitutional predicate is loaded with latent growth potential. The Sixth Amendment (the road not chosen) rests on a very narrow base; the Fourteenth Amendment base, by contrast, is much broader. The Sixth Amendment provision is, "In all criminal prosecutions, the accused shall enjoy the right to a ... trial, by an impartial jury...." By its very terms, the guarantee is limited to criminal cases. There is no such curtailment on the reach of the Fourteenth Amendment's equal protection clause. The Sixth Amendment right, moreover, is only available to "the accused"; the equal protection right may well be available to both sides of the trial table and civilly as well as criminally.[2]

Although the critical opening words of the Fourteenth Amendment are "No State shall ...," the very establishment of a jury selection procedure may qualify as State action, regardless of which party ultimately exercises the peremptory challenges in an allegedly discriminatory fashion. Indeed, the Supreme Court has kept alive the possibility that defense counsel may fall under the scrutiny of the equal protection clause. "We express no views on whether the Constitution imposes any limit on the exercise of per-

---

ground (equal protection) which the petitioner Batson had expressly declined to raise either on *certiorari* or before the Supreme Court of Kentucky.

**2.** By way of interesting contrast, the systematic exclusion of women from jury panels was held to violate the Sixth Amendment right to an impartial jury. *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975).

emptory challenges by defense counsel." 476 U.S. at —— n. 12, 106 S.Ct. at 1718–19 n. 12, 90 L.Ed.2d at 82 n. 12.[3]

In keeping with that broader constitutional base, Justice Powell, for a seven-justice majority, identified three distinct groups of beneficiaries of equal protection, all of whom would be aggrieved by the use of peremptory strikes in a racially discriminatory fashion. First, of course, is the accused himself, the only party who would have been a beneficiary under the Sixth Amendment:

"The petit jury has occupied a central position in our system of justice by safeguarding a person accused of crime against the arbitrary exercise of power by prosecutor or judge.... Those on the venire must be 'indifferently chosen,' to secure the defendant's right under the Fourteenth Amendment to 'protection of life and liberty against race or color prejudice.'" (Citation omitted).

476 U.S. at ——, 106 S.Ct. at 1717, 90 L.Ed.2d at 81. If the accused were the only party benefitting from the constitutional protection, the *Batson* strictures would apply only to the suspect use of peremptory challenges by the prosecutor.

Justice Powell goes on, however, to identify a second group of beneficiaries and, therefore, a distinct rationale for the *Batson* holding:

"Racial discrimination in selection of jurors harms not only the accused whose life or liberty they are summoned

---

**3.** *But see United States v. Leslie,* 783 F.2d 541, 565 (5th Cir.1986):

"[E]very jurisdiction which has spoken to the matter, and prohibited prosecution case-specific peremptory challenges on the basis of cognizable group affiliation, has held that the defense must likewise be so prohibited."

The dissenting opinion of Chief Justice Burger in *Batson* reasons to a similar effect:

"[T]he clear and inescapable import of this novel holding will inevitably be to limit the use of this valuable tool to both prosecutors and defense attorneys alike. Once the Court has held that *prosecutors* are limited in their use of peremptory challenges, could we rationally hold that defendants are not?" (Emphasis in original).

476 U.S. at ——, 106 S.Ct. at 1738, 90 L.Ed.2d at 107 (Burger, C.J., dissenting).

to try. ... As long ago as *Strauder* [*v. State of West Virginia*, 100 U.S. (10 Otto) 303, 25 L.Ed. 664], therefore, the Court recognized that by denying a person participation in jury service on account of his race, the State unconstitutionally discriminated against the excluded juror."

476 U.S. at ——, 106 S.Ct. at 1717–18, 90 L.Ed.2d at 81. With the recognition of "the excluded juror" as an aggrieved party in his own right, the strictures would seem to apply with equal logic to prosecutor, to criminal defense attorney, to plaintiff's attorney, and to civil defense attorney alike. There would be, moreover, under that rationale, no necessary correlation between the race of the excluded juror and the race of the criminal defendant. *See, e.g., Commonwealth v. DiMatteo*, 12 Mass.App.Ct. 547, 427 N.E.2d 754 (1981) (peremptory challenge of a black juror by a white defendant disallowed).

*Allen v. Hardy, supra*, reaffirmed that the purpose of *Batson v. Kentucky* was broader than the protection of the rights of the defendant alone. A racially "excluded juror" is protected by *Batson*, quite aside from any impact on the defendant and, arguably, even when the source of the exclusion has been the defendant. That opinion stated:

"[T]he decision [of *Batson* ] serves other values as well. Our holding ensures that States do not discriminate against citizens who are summoned to sit in judgment against a member of their own race and strengthens public confidence in the administration of justice. The rule in *Batson*, therefore, was designed 'to serve multiple ends'...."

106 S.Ct. at 2880, 92 L.Ed.2d at 205.

Justice Powell adds yet a third class of beneficiaries and yet a third rationale for the *Batson* holding:

"The harm from discretionary jury selection extends beyond that inflicted on the defendant and the excluded juror to touch the entire community. Selection procedures that purposefully exclude black persons from juries

undermine public confidence in the fairness of our system of justice."

476 U.S. at ——, 106 S.Ct. at 1718, 90 L.Ed.2d at 81. Using that third express rationale, posit the case of the State's prosecuting a white policeman, or possibly even a member of the Ku Klux Klan, for the brutal beating of a black victim. It might well be in such a demographic posture that it would be defense counsel for the policeman or the Klansman who might be deliberately using peremptory challenges to strike all blacks from the jury. It is difficult to see how that use of the peremptory challenge would "undermine public confidence in the fairness of our system of justice" any less than would such a use on some other occasion by the public prosecutor. "The potential for racial prejudice, further, inheres in the defendant's challenge as well." 476 U.S. at ——, 106 S.Ct. at 1729, 90 L.Ed.2d at 95 (Marshall, J., concurring). In the case of the white policeman or Klansman, what would be the equal protection right of the defendant if the prosecutor were using all available peremptory challenges deliberately to strike as many whites as possible from the jury upon no other basis than that they were white?

In terms of the broader impact of the *Batson* rule, Justice Marshall, in his dissenting opinion in *Allen v. Hardy, supra,* (joined by Justice Stevens), has identified the larger interests being served:

> " 'The effect of excluding minorities goes beyond the individual defendant, for such exclusion produces "injury to the jury system, to the law as an institution, to the community at large, and to the democratic ideal reflected in the processes of our courts." ' "

106 S.Ct. at 2882, 92 L.Ed.2d at 207 (Marshall, J., dissenting). It is Justice Marshall's conclusion that "criminal defendants will not be the only beneficiaries of the rule." *Id.*

In any event, the constitutional base of the equal protection clause is a broad one and the possible repercussions from *Batson v. Kentucky* are open-ended. In *Batson* it-

self, however, it was a criminal defendant who invoked the protection. That is also the posture of the case at bar.

### The Allocation of the Burden of Production

Initially, the burden is on the party claiming an equal protection violation to establish a *prima facie* case in that regard. The Supreme Court stated, at 476 U.S. at ——, 106 S.Ct. at 1721, 90 L.Ed.2d at 85:

> "As in any equal protection case, the 'burden is, of course,' on the defendant who alleges discriminatory selection of the venire 'to prove the existence of purposeful discrimination.'"

Absent the establishment of such a *prima facie* case, there is no obligation on the opposing party to offer any explanation for the use of a peremptory challenge and no entitlement on the part of the moving party to a hearing on the issue.

*Batson* established clear guidelines by which a criminal defendant can meet this burden of establishing a *prima facie* case of discrimination. It is no longer necessary to show a systematic pattern of exclusion, based on race, over a series of cases.[4] As the Supreme Court stated:

> "[A] defendant may establish a *prima facie* case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial."

476 U.S. at ——, 106 S.Ct. at 1722–23, 90 L.Ed.2d at 87.

In the typical criminal case, the defendant must show that he is a member of a "cognizable racial group"—it is hard to imagine anybody who isn't—and essentially that the prosecutor's use of peremptory challenges operated "to

---

4. A showing of a past pattern of discrimination by the prosecutor's office may, however, be a relevant factor in persuading a judge to find a *prima facie* case of purposeful discrimination in the first instance and/or to be unpersuaded by the State's "racially neutral" explanation in the second instance. *United States v. Mathews*, 803 F.2d 325, 332 (7th Cir.1986).

remove from the venire members of the defendant's race."
As the Supreme Court discussed this burden of production:

"To establish such a case, the defendant first must show
that he is a member of a cognizable racial group, ... and
that the prosecutor has exercised peremptory challenges
to remove from the venire members of the defendant's
race. Second, the defendant is entitled to rely on the
fact, as to which there can be no dispute, that peremptory
challenges constitute a jury selection practice that per-
mits 'those to discriminate who are of a mind to discrimi-
nate.' ... Finally, the defendant must show that these
facts and any other relevant circumstances raise an infer-
ence that the prosecutor used that practice to exclude the
veniremen from the petit jury on account of their race.
This combination of factors in the empanelling of the petit
jury, as in the selection of the venire, raises the necessary
inference of purposeful discrimination." (Citations omit-
ted).

476 U.S. at ——, 106 S.Ct. at 1723, 90 L.Ed.2d at 87–88.

■ A showing by defense counsel that the prosecutor
has used peremptory challenges to strike potential jurors of
the defendant's race does not automatically cast a burden
on the prosecutor to offer a neutral explanation. Procedur-
ally, the judge must make a ruling in that regard. The
*Batson* opinion is uncharacteristically murky about precise-
ly what should cause the judge to require the prosecutor to
go forward. The quite possibly careless use of the phrase
*"prima facie* case" suggests that the defendant need only
meet a burden of production, the establishing of a case that
would be legally sufficient to persuade the hearing judge
whether it actually did persuade him or not. Other lan-
guage, however, sends the strong message that the actual
striking of the prospective jurors of the defendant's race
only gives rise to an inference of discrimination and that the
judge will consider the fact of the strikes along with other
surrounding facts in deciding whether to draw the infer-

ence.[5] There is thus not merely a burden of production but a closely related burden of at least threshold persuasion before the prosecution is required to offer a racially neutral explanation for the peremptory challenges.[6] The majority opinion discussed this triggering or burden-shifting step:

"In deciding whether the defendant has made the requisite showing, the trial court should consider all relevant circumstances. For example, a 'pattern' of strikes against black jurors included in the particular venire

---

**5.** In several lower court cases, the courts have not drawn the inference of purposeful discrimination notwithstanding a demonstrated pattern of peremptory challenges aimed at black males. In *Commonwealth v. McKenbrick,* 356 Pa.Super. 64, 514 A.2d 144 (1986), the prosecutor removed all four black venire members by challenging one for cause and peremptorily striking the other three. Notwithstanding this pattern, the court found that a *prima facie* case of purposeful discrimination had not been shown. Significant other circumstances were that both the defendant and the victim were black, the greater number of witnesses for both sides were black, and the case involved a killing in which racial groups would not be inclined to take different sides. The court concluded that no racial issue was involved in the case. In *United States v. Dennis,* 804 F.2d 1208 (11th Cir.1986), the defendant failed to establish a *prima facie* case because the judge concluded that black males specifically, as opposed to blacks generally, were not a cognizable racial group. The prosecutor had used three of his six available peremptory challenges to strike black males but had accepted two black females on the jury without challenge. The court concluded that the pattern of strikes did not demonstrate purposeful discrimination based upon race generally, as opposed to more selective discrimination based upon a race-sex combination. For a case where the numbers were simply insufficient to establish a meaningful pattern, *see Wilder v. State,* 498 N.E.2d 1295 (Ind.1986).

**6.** In *Fleming v. Kemp,* 794 F.2d 1478 (11th Cir.1986), an inference of purposeful discrimination was drawn from the fact that the prosecutor used eight of his ten peremptory challenges to exclude black venire members, notwithstanding the fact that not all black venire members were excluded from the jury. A *prima facie* case of purposeful discrimination was also established in *Mincey v. State,* 180 Ga.App. 263, 349 S.E.2d 1 (1986), in which case the prosecutor exercised all of his peremptory challenges in order to exclude all four potential black jurors. In *United States ex rel. Kyles v. O'Leary,* 642 F.Supp. 222 (N.D.Ill.1986), the prosecutor had peremptorily challenged six black venire members. In drawing the inference of purposeful discrimination, the Court also considered as another "relevant circumstance" the demographic factors of the defendant's being black and the victim's being white.

might give rise to an inference of discrimination.  Similarly, the prosecutor's questions and statements during *voir dire* examination and in exercising his challenges may support or refute an inference of discriminatory purpose. These examples are merely illustrative.  We have confidence that trial judges, experienced in supervising *voir dire*, will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a *prima facie* case of discrimination against black jurors."

476 U.S. at ——, 106 S.Ct. at 1723, 90 L.Ed.2d at 88.

Justice White's concurring opinion clearly articulates the discretionary range in which the trial judge operates:

"The Court now rules that such use of peremptory challenges in a given case may, but does not necessarily, raise an inference, which the prosecutor carries the burden of refuting, that his strikes were based on the belief that no black citizen could be a satisfactory juror or fairly try a black defendant."

476 U.S. at ——, 106 S.Ct. at 1725, 90 L.Ed.2d at 90 (White, J., concurring).  Justice White goes on:

"If the defendant objects, the judge, in whom the Court puts considerable trust, may determine that the prosecution must respond. . . .

The Court emphasizes that using peremptory challenges to strike blacks does not end the inquiry; it is not unconstitutional, without more, to strike one or more blacks from the jury.  The judge may not require the prosecutor to respond at all."

476 U.S. at ——, 106 S.Ct. at 1725, 90 L.Ed.2d at 91 (White, J., concurring).  *See also Commonwealth v. Robinson,* 382 Mass. 189, 195, 415 N.E.2d 805, 809–810 (1981); *People v. Rousseau,* 129 Cal.App.3d 526, 536–537, 179 Cal.Rptr. 892, 897–898 (1982).

■ In the case at bar, the appellant clearly showed enough to raise a permitted inference of discrimination. The appellant, a black, was a member of "a cognizable

racial group." Three prospective jurors who were black were called up individually as both parties then had the opportunity to exercise peremptory strikes. All three blacks were struck from the jury by the prosecutor. The resulting jury was exclusively white. The appellant showed thereby that "the prosecutor [had] exercised peremptory challenges to remove from the venire members of the defendant's race." The appellant, moreover, timely challenged this use of peremptory challenges on the part of the prosecutor.[7] Under *Batson*, a ruling on the threshold merits was called for as to whether the prosecutor was required to offer a racially neutral explanation for his peremptory challenges.[8] No such ruling was made.

## The Shifting of the Burden

Once the judge rules that the defendant has met that initial burden, the obligation then passes to the prosecutor to satisfy the court that there is "a neutral explanation" for the use of the peremptory challenges:

"Once the defendant makes a *prima facie* showing, the burden shifts to the State to come forward with a neutral explanation for challenging black jurors. Though this requirement imposes a limitation in some cases on the full peremptory character of the historic challenge, we emphasize that the prosecutor's explanation need not rise to the level justifying exercise of a challenge for cause."

---

7. Several state cases have held that, in order to preserve the jury selection issue for appeal, the defendant must make a timely objection both when the prosecutor uses a peremptory challenge to exclude a member of a cognizable racial group and also after the jury has been selected but before it has been sworn. *Weekly v. State*, 496 N.E.2d 29 (Ind.1986); *Williams v. State*, 712 S.W.2d 835 (Tex.1986).

8. Since the initial burden of production is on the defendant to show the existence of purposeful discrimination, it follows that the defendant has the burden of preserving the record in this regard. In *Weekly v. State*, 496 N.E.2d 29 (Ind.1986), it was held that the defendant failed to raise an inference of purposeful discrimination because he failed to produce any evidence of the number of prospective jurors that were called, the number that were struck, and the racial identity of the struck jurors.

476 U.S. at ——, 106 S.Ct. at 1723, 90 L.Ed.2d at 88. As the Supreme Court carefully pointed out, however, the prosecutor's explanation "need not rise to the level justifying exercise of a challenge for cause." It need not even be a good reason. It need only be a racially neutral reason. Except when it violates the equal protection clause, the peremptory challenge retains its peremptory attribute of unaccountability. On the other hand, "the prosecutor may not rebut the defendant's *prima facie* case of discrimination by stating merely that he challenged jurors of the defendant's race on the assumption—or his intuitive judgment—that they would be partial to the defendant because of their shared race." *Id.* "Nor may the prosecutor rebut the defendant's case merely by denying that he had a discriminatory motive or 'affirming his good faith in individual selections.'" *Id.* The prosecutor, rather, "must articulate a neutral explanation related to the particular case to be tried." *Id.*

■ To rebut the case of presumptive prejudice, one additional step is needed. It is that step which the State overlooked in its argument before us. Not only must the prosecutor "articulate a neutral explanation," but the trial judge must be satisfied by that neutral explanation and make a ruling to that effect.[9]

■ Three days after the initial challenging of the three black veniremen in this case, the assistant state's attorney placed on the record his reasons for using a peremptory challenge against each of the three. He stated that he challenged one 19–year-old male laborer because of 1) his youth, 2) an occupational background that is similar to that of the defendant, and 3) because the prosecutor thought

---

9. The only case we have found that even discusses the procedure to be followed in a *Batson* hearing is *United States v. Davis,* 809 F.2d 1194 (6th Cir.1987). *State v. Gilmore,* 103 N.J. 508, 511 A.2d 1150 (1986) also deals with the procedural requirements of a hearing dealing with alleged abuses in the use of the peremptory challenge, but it must be noted that that case was based upon the New Jersey Constitution dealing with the right to trial by an impartial jury.

that prospective juror "would be sympathetic with the defendant." *See People v. Hall,* 35 Cal.3d 161, 197 Cal.Rptr. 71, 672 P.2d 854 (1983). A second prospective juror was struck because "she appeared to be very nervous and fidgety. That was not the type of individual we wanted for a juror. Also, her estranged husband had a fairly serious criminal record." The assistant state's attorney also noted with respect to that juror that there was some indication that she might be a relative of a person whose home had recently been the subject of a drug bust. A third prospective juror was struck because "she just showed an utter contempt for the whole proceeding. She never cracked a smile, no facial expression during the whole time.... I decided we did not want her serving on the jury." *See People v. Hall, supra,* 35 Cal.3d at 165, 197 Cal.Rptr. at 73, 672 P.2d at 856; *See also King v. County of Nassau,* 581 F.Supp. 493, 498 (E.D.N.Y.1984).

Those explanations might well have satisfied the trial judge that the three prospective jurors had, indeed, been struck for neutral reasons and not primarily because of their race.[10] Understandably relying on the then-prevailing law of *Swain v. Alabama,* however, the trial judge made no rulings in that regard, just as he had made no ruling that explanations were even necessary. He rather applied the *Swain v. Alabama* rule that, as a matter of law, within the context of an individual case no explanation or justification was called for. While defense counsel was objecting to the State's "tardy" explanations (that, in itself, would have presented no problem), the trial judge interrupted and stated, "They don't have to ... it is a peremptory challenge as I

---

**10.** Among the cases that have found the explanation by the prosecutor to be adequately racially neutral are *Phillips v. State,* 496 N.E.2d 87 (Ind.1986); *People v. Simpson,* 121 A.2d 881, 504 N.Y.2d 115 (1986); *United States v. Mathews,* 803 F.2d 325 (7th Cir.1986); *People v. Peters,* 144 Ill.App.3d 310, 98 Ill.Dec. 731, 494 N.E.2d 853 (1986); *People v. Lester,* 145 Ill.App.3d 720, 99 Ill.Dec. 543, 495 N.E.2d 1278 (1986); *State v. Newman,* 491 So.2d 174 (La.1986). A case holding that the prosecution had failed to provide a satisfactorily racially neutral explanation was *State v. Butler,* 731 S.W.2d 265 (Mo.App.1987).

see it." In reiterating the then-prevailing standard, the trial judge stated:

"There is no basis to show that it is a policy of the office [of the State's Attorney] to strike because of race and in the absence of such a showing I don't think that the court can conclude just because it happened in this case that it was done for racial reasons."

It is not, of course, for us on appellate review to assess the adequacy of the State's explanation, any more than it is for us on appellate review to draw the inference triggering the need for the State's explanation in the first place. It is rather for the trial judge, observing the entire proceeding firsthand and able to evaluate credibility, to make findings of fact with respect both to the *prima facie* case of discrimination to be proved by the defendant and the rebuttal of that *prima facie* case to be proved by the prosecution. The trial judge, in a quasi-factfinding capacity on this issue, must resolve both questions. As *Batson* explained:

"The prosecutor therefore must articulate a neutral explanation related to the particular case to be tried. The trial court then will have the duty to determine if the defendant has established purposeful discrimination."

476 U.S. at ——, 106 S.Ct. at 1723–24, 90 L.Ed.2d at 88–89.

*Appellate Deference to Finding by Trial Judge*

Once the trial judge has made those determinations, whichever way they go, any subsequent reviewing court must pay great deference to those determinations. With direct reference to such a ruling made by the trial judge, the Supreme Court explained:

" '[A] finding of intentional discrimination is a finding of fact' entitled to appropriate deference by a reviewing court.... Since the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference." (Citation omitted).

476 U.S. at ——, 106 S.Ct. at 1724 n. 21, 90 L.Ed.2d at 89 n. 21. *And see United States v. Woods*, 812 F.2d 1483 (4th Cir.1987).

Our problem in the present case, of course, is that there were no rulings on the critical issue to which we can extend appropriate deference. Our remand is on exclusively procedural grounds, not on the substantive merits of the equal protection issue.

### The Appropriate Appellate Response

Our decision with respect to the procedural requirements for handling the equal protection question does not, as the appellant urges, necessarily mandate a reversal of his convictions. Again, *Batson* is dispositve. In that case, as here, the trial judge had applied the law according to *Swain v. Alabama* and had made no findings with respect to either 1) the *prima facie* case of racial discrimination, or 2) the adequacy of the State's rebuttal of that *prima facie* case. In that case, as here, the appropriate redress was a remand for further proceedings. If, upon remand, the trial judge should rule that the appellant has not established a *prima facie* case or, in the alternative, that the State has provided satisfactorily neutral explanations to rebut that *prima facie* case, the convictions will stand. Only if the trial judge finds a *prima facie* case of discrimination not adequately rebutted by the State will the judgments of convictions have to be reversed and the case remanded for retrial on the merits. As the Supreme Court explained:

"In this case, petitioner made a timely objection to the prosecutor's removal of all black persons on the venire. Because the trial court flatly rejected the objection without requiring the prosecutor to give an explanation for his action, we remand this case for further proceedings. If the trial court decides that the facts establish, *prima facie*, purposeful discrimination and the prosecutor does not come forward with a neutral explanation for his action, our precedents require that petitioner's conviction be reversed."

476 U.S. at ——, 106 S.Ct. at 1725, 90 L.Ed.2d at 90. *See also Griffith v. Kentucky,* 479 U.S. ——, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987).[11]

### *Unresolved Issue: The Appropriate Trial Court Response*

Figuring out the possible remedies available to us at the appellate level does not answer the question of what remedies are available to the trial judge. If the trial judge rules 1) that the State must offer explanations for its use of peremptories and 2) that the explanations are inadequate, what follows? *Batson* is singularly unilluminating. "[W]e make no attempt to instruct these courts how best to implement our holding today." 476 U.S. at —— n. 24, 106 S.Ct. at 1724 n. 24, 90 L.Ed.2d at 90 n. 24. As Chief Justice Burger characterized that disinclination to provide instruction, "The Court does not tarry long over any of these difficult, sensitive problems, preferring instead to gloss over them as swiftly as it slides over centuries of history." 476 U.S. at ——, 106 S.Ct. at 1741, 90 L.Ed.2d at 110 (Burger, C.J., dissenting). Two remedial possibilities are readily apparent:

> "[W]e express no view on whether it is more appropriate in a particular case, upon a finding of discrimination against black jurors, for the trial court to discharge the venire and select a new jury from a panel not previously associated with the case, ... or to disallow the discriminatory challenges and resume selection with the improperly challenged jurors reinstated on the venire." (Citation omitted).

476 U.S. at —— n. 24, 106 S.Ct. at 1724 n. 24, 90 L.Ed.2d at 90 n. 24. With respect to that reluctance to spell out the appropriate remedy at the trial level, the Chief Justice sympathized with the plight of the trial judge:

---

**11.** *And see Wise v. State,* 179 Ga.App. 115, 346 S.E.2d 393 (1986); *Sparks v. State,* 180 Ga.App. 467, 349 S.E.2d 504 (1986); *People v. Hockett,* 121 A.D.2d 878, 503 N.Y.S.2d 995 (1986).

"That leaves roughly 7,000 general jurisdiction state trial judges and approximately 500 federal trial judges at large to find their way through the morass the Court creates today. The Court essentially wishes these judges well as they begin the difficult enterprise of sorting out the implications of the Court's newly created 'right.' I join my colleagues in wishing the nation's judges well as they struggle to grasp how to implement today's holding."

476 U.S. at ——, 106 S.Ct. at 1741, 90 L.Ed.2d at 110 (Burger, C.J., dissenting).

Fashioning an appropriate remedy would appear to fall within the broad discretionary range necessary for the trial judge's effective management of a trial. If a half a dozen or more of prospective jurors have been unconstitutionally challenged, it may be necessary to dismiss the entire venire and to begin again with a new panel. If a single prospective juror has been unconstitutionally challenged, it may be adequate to reinstate that juror on the venire. There is the lurking danger, of course, that an unsuccessfully challenged juror may now bear an animus against the challenger arising from the challenge itself. Caution also must be exercised so that the choice of remedies does not permit the challenger to accomplish indirectly what he may not accomplish directly.

### Unresolved Issue: Mixed Motives

The heart of the *Batson v. Kentucky* holding is at 476 U.S. at ——, 106 S.Ct. at 1719, 90 L.Ed.2d 83:

"[T]he Equal Protection Clause forbids the prosecutor to challenge potential jurors *solely* on account of their race." (Emphasis supplied).

The adverb "solely" is a teaser. What should be the court's response where the prosecutor feels two or more antipathies toward a challenged venireman, one of which is unabashedly racial but the others of which are not? If any one of the antipathies, standing alone, would have been sufficient to trigger the challenge, is the situation different from that in which only the combination of antipathies was

sufficient to trigger the challenge? There appears to be wisdom, again, in leaving such matters in the broad discretion of the trial judge.

### Unresolved Issue: Affirmative Uses of Peremptories

What are the equal protection implications where the motive of the peremptory challenger is that he "loved not Prospective Juror # 12 less, but only Prospective Juror # 13 more?" It is again an article of faith among trial advocates and part of the core curriculum of trial advocacy seminars and institutes that the ideal jury will be made up of twelve clones of one's client. When, therefore, two skilled professionals, each armed with a cartridge belt full of peremptory challenges, sit down before a panel of forty or fifty prospective jurors knowing that only twelve will survive, their aim is to leave standing the most favorable jury possible. The purpose is not only to eliminate the negative but to accentuate the positive. Admittedly, much guesswork is involved, but it is intelligent guesswork, educated hunches, background checks and statistical probabilities, hopefully valid generalizations and the law of averages. The goal is not only to minimize the cultural differences and the lack of points of identity that might likely distance a juror from one's client but also to maximize the likely sympathies, empathies and common experiences that will help a juror identify with one's client. Generally speaking, the issue is not that of good jurors versus bad jurors or adequate jurors versus inadequate jurors. It is rather the wily maneuvering of two skilled chess players to obtain a slight edge, a barely discernible "tilt," as they mold a jury.

As long as peremptory challenges were truly peremptory, these trial tactics, wise or foolish, were beyond constitutional scrutiny. Will *Batson* have an impact upon them? Will it be an adequately neutral explanation that prospective juror # 12, of the same race as the defendant and with no arguably negative attributes, was challenged simply to open up a place for prospective juror # 13, coincidentally of a different race but more significantly loaded with similarities

to the crime victim, to the critical State's witness or to the investigating officer? May even jurors thought to be favorable be challenged to make room for other jurors thought to be more favorable? Even with respect to the affirmative choice of the more favorable over the merely adequate, it would appear that if the factor influencing the chess move be racial, it is suspect; if the factors be non-racial, they are, wise or foolish, beyond scrutiny.

At what point may the quantity of the peremptory challenges influence the quality of the peremptory exercise? If it is legitimate to strike prospective juror #12 to make room for prospective juror #13, even where there is a coincidental racial impact, is it equally legitimate to strike prospective jurors #12, 13, 14, 15, 16, and 17 to make room for "dream juror" #18, even when there are coincidentally six racial impacts? Assuming a credible non-racial explanation, will a six-fold impact be measured any differently than a one-fold impact? Again, there seems to be much wisdom in leaving these matters to the discretion of the trial judge.

Some interesting questions may arise even when the motive behind a given peremptory challenge is indisputably racial. Given the case of a black defendant and a single peremptory challenge, would it be any less unconstitutional for the prosecutor to strike one of the twelve black jurors to make room for a single white than to strike the only black juror to make room for an all-white jury? Would the result be any different if the defense attorney struck one of the twelve whites, solely on the basis of race, to make room for a single black? *Batson* has probably raised more questions than it has answered.

### *Unresolved Issue: Verifiable Group Characteristics*

The heart of the problem dealt with, or created by, *Batson*, is that there is a basic incompatibility between the rhetoric of the equal protection clause and the traditional tenets of trial advocacy. The trial advocate recognizes the danger of overgeneralization but nonetheless believes that

there is statistical validity to properly limited generalizations. He operates on the basis of those generalizations, sometimes the product of his experience and sometimes the product of statistical studies, in the jury selection process.

The good trial advocate starts with the proposition that the last thing he wants is a neutral, unbiased and unprejudiced jury. He wants, of course, the most biased and prejudiced jury he can possibly come up with, provided it is biased and prejudiced his way. This by no means suggests that the American criminal justice system does not seek neutral, unbiased and unprejudiced juries. It achieves the goal of an impartial jury, however, by the process of dynamic equilibrium. From the healthy clash of two skilled adversaries, each striving for the most partial jury obtainable in his direction, there emerges the synthesis of resultant impartiality. If one party to the adversarial clash were to be unilaterally hobbled, the apparatus would go unpredictably out of kilter.

As they engage in the educated guesswork of jury selection, each adversary tries to spot the probable prejudices coursing through the mainstream and the byways of American life—racial, religious, sexual, ethnic, educational, residential, economic, social—and then to maximize those running in his favor and to minimize those running against him. The trial advocate believes that valid generalizations can be made with respect to group characteristics, sympathies, prejudices, etc. He believes, for instance, that Catholics are more likely than Unitarians to be anti-abortion. He believes, for instance, that German Lutheran farmers are more likely than inner-city blacks to be pro-Republican. It is not un-American to believe such things; it may be imbecilic not to. The advocate recognizes, of course, that an individual member of a group does not necessarily share the group's characteristics but that there is nonetheless a more-than-random likelihood that that individual will. With avail-

able peremptory challenges, the trial advocate plays the law of averages.[12] Using group characteristics as a predictor, the trial advocate does not remotely suggest that a member of the group will necessarily be more sympathetic or unsympathetic to his cause but only that there is a statistically enhanced likelihood that that may be the case.

With respect to the racial category, at least, the Supreme Court has denied the utility of using group characteristics to predict individual performance. Throughout the *Batson* opinion, it condemns the making of assumptions about a racial group, the strong implication being that the fault with assumptions is that they are false assumptions. The heart of the holding, at 476 U.S. at ——, 106 S.Ct. at 1719, 90 L.Ed.2d 83, was:

> "[T]he Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the *assumption* that black jurors as a group will be unable impartially to consider the State's case against a black defendant." (Emphasis supplied).

The *Batson* opinion goes on, at 476 U.S. at ——, 106 S.Ct. at 1719, 90 L.Ed.2d at 88, to hold that the peremptory challenger may not rely upon assumptions or intuitive judgment about a racial group:

> "But the prosecutor may not rebut the defendant's *prima facie* case of discrimination by stating merely that he challenged jurors of the defendant's race *on the assumption—or his intuitive judgment—*that they would be partial to the defendant because of their shared race." (Emphasis supplied).

Within a paragraph, it reiterates that:

> "[T]he Equal Protection Clause ... forbids the States to strike black veniremen on the *assumption* that they will

---

**12.** The trial advocate heeds columnist John Lardner's variations on a theme from Ecclesiastes, "The race is not always to the swift, nor the battle to the strong, but that's the way to bet."

be biased in a particular case simply because the defendant is black." (Emphasis supplied).

*Id.*

Chief Justice Burger raises the interesting possibility of what the constitutional result would be if the peremptory challenger's beliefs about group characteristics were based not upon his subjective assumptions but upon scientifically acceptable sociological studies:

"The Court is also silent on whether a State may demonstrate that its use of peremptories rests not merely on 'assumptions,' ... but on sociological studies or other similar foundations.... For '[i]f the assessment of a juror's prejudices, based on group affiliation is accurate, ... then counsel has exercised the challenge as it was intended—to remove the most partial jurors.'" (Citation omitted).

476 U.S. at —— n. 5, 106 S.Ct. at 1738 n. 5, 90 L.Ed.2d 106 n. 5 (Burger, C.J., dissenting).

*Unresolved Issue: Will This Application of the Equal Protection Clause Be Judged By General Equal Protection Law Standards?*

The Chief Justice has raised another interesting problem not resolved by the *Batson* majority. If this constitutional scrutiny of the peremptory challenge is predicated upon the equal protection clause, are we then afloat on the broad sea of equal protection case law? If not, what is the limiting principle? Chief Justice Burger's observations about subjecting the peremptory challenge to general scrutiny according to equal protection standards suggest intriguing and far-flung possibilities:

"[I]f conventional equal protection principles apply, then presumably defendants could object to exclusions on the basis of not only race, but also sex, ... age, ... religious or political affiliation, ... mental capacity, ... number of children, ... living arrangements, ... and employment in a particular industry, ... or profession....

In short, it is quite probable that every peremptory challenge could be objected to on the basis that, because it excluded a venireman who had some characteristic not shared by the remaining members of the venire, it constituted a 'classification' subject to equal protection scrutiny." (Citations omitted).

476 U.S. at ——, 106 S.Ct. at 1737, 90 L.Ed.2d at 105–106 (Burger, C.J., dissenting).

The Chief Justice is quick to point out, however, that in his opinion the majority is not relying on broad equal protection principles:

"That the Court is not applying conventional equal protection analysis is shown by its limitation of its new rule to allegations of impermissible challenge *on the basis of race;* the Court's opinion clearly contains such a limitation." (Emphasis in original).

476 U.S. at ——, 106 S.Ct. at 1737, 90 L.Ed.2d at 105 (Burger, C.J., dissenting).

It is by no means clear how the *Batson* opinion can rest exclusively on the equal protection clause without incorporating general equal protection law principles.

### Unresolved Issue: What is "Race"?

The application of *Batson v. Kentucky* to the case at hand is simple. The appellant is black, as was Batson. The three prospective jurors who were struck here were also black, as were the four prospective jurors in *Batson*. In discussing and analyzing its ruling, *Batson* is replete with references to the rights of a black defendant who is denied a jury including members of his own race and to the rights of black prospective jurors to jury service. Conceivably, that is all the case is about.

On other occasions, however, the Supreme Court states the undergirding constitutional principle in broader and more neutral language. "[T]he Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race." 476 U.S. at ——, 106 S.Ct. at

1719, 90 L.Ed.2d at 83. "The defendant initially must show that he is a member of a racial group capable of being singled out for different treatment." 476 U.S. at ——, 106 S.Ct. at 1722, 90 L.Ed.2d at 86. "[T]his Court has recognized that a defendant may make a prima facie showing of purposeful racial discrimination in selection of the venire by relying solely on the facts concerning its selection *in his* case." 476 U.S. at ——, 106 S.Ct. at 1722, 90 L.Ed.2d at 87. "The core guarantee of equal protection ensuring citizens that their State will not discriminate on account of race, would be meaningless were we to approve the exclusion of jurors on the basis of such assumptions, which arise solely from the jurors' race." 476 U.S. at ——, 106 S.Ct. at ——, 90 L.Ed.2d at 88. The final statement of principle is framed in broad and neutral terms:

> "By requiring trial courts to be sensitive to the racially discriminatory use of peremptory challenges, our decision enforces the mandate of equal protection and furthers the ends of justice. In view of the heterogeneous population of our nation, public respect for our criminal justice system and the rule of law will be strengthened if we ensure that no citizen is disqualified from jury service because of his race."

476 U.S. at ——, 106 S.Ct. at 1723, 90 L.Ed.2d at 89.

What will be the limits of the logic of *Batson?* It may, of course, be confined to cases where black defendants suffer the denial of black jurors. Such, however, would be a strangely one-directional application of the equal protection principle. Will the rule of *Batson* be available to white defendants and to defendants who could be classified as members of the Mongoloid race? Will American Indians be treated as members of the Mongoloid race? Will Hispanics be treated as a distinct racial group? [13] Will European

---

**13.** In *Bueno-Hernandez v. State,* 724 P.2d 1132 (Wyo.1986), the court considered the challenge that the prosecutor had denied a defendant equal protection of the law when he peremptorily challenged three venire members with Spanish surnames. The court considered the

Spaniards qualify as Hispanics, even without an Indian component to their racial makeup? Will *Batson* apply to peremptory challenges directed at a racial group of jurors without any correlation between that racial group and the race of the defendant? Might *Batson* apply if the only correlation is between the race of the jurors challenged and the race of a crucial defense witness or a crucial State's witness?

Perhaps more fundamentally, how broad or narrow is the term "race"? The Supreme Court has deemed discrimination by states on the basis of ancestry to be violative of the equal protection clause of the Fourteenth Amendment. *Hernandez v. Texas,* 347 U.S. 475, 479, 74 S.Ct. 667, 671, 98 L.Ed. 866 (1954); *Oyama v. California,* 332 U.S. 633, 646, 68 S.Ct. 269, 275, 92 L.Ed. 249 (1948); *Hirabayashi v. United States,* 320 U.S. 81, 100, 63 S.Ct. 1375, 1385, 87 L.Ed. 1774 (1943); *Hurd v. Hodge,* 334 U.S. 24, 32, 68 S.Ct. 847, 851, 92 L.Ed. 1187 (1948). Will membership in an identifiable group based upon ancestry, land of national origin, or some other ethnic consideration qualify for the rule of *Batson?*

Insight into the thinking of the Supreme Court on the subject of race was provided by the recent decision of *Saint Francis College v. Al-Khazraji,* —— U.S. ——, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987), in which Justice White spoke for a unanimous Court. The Court was there dealing, to be sure, with 42 U.S.C. § 1981, which provides:

> "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give

issue but found that the prosecutor had offered a sufficiently neutral explanation. *People v. Trevino,* 39 Cal.3d 667, 217 Cal.Rptr. 652, 704 P.2d 719 (1985) also considered the challenging of six potential jurors with Spanish surnames, although that challenge was based upon the California Constitution's guarantee of an impartial jury. There is something strangely arbitrary about a criterion that would seem to cover the case of the former Miss Kelly who has married Mr. Gonzales but not the case of the former Miss Gonzales who has married Mr. Kelly.

evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

The Court pointed out that § 1981 does not itself use the word "race," any more than the equal protection clause uses the word "race." The Court was quick to add, however, that it has construed the section to forbid "racial" discrimination, *Runyon v. McCrary*, 427 U.S. 160, 168, 174–175, 96 S.Ct. 2586, 2593, 49 L.Ed.2d 415 (1976), just as the equal protection clause has been construed to forbid racial discrimination.

The defendants in *Saint Francis College* claimed that alleged discrimination by a white Board of Trustees against an American citizen born in Iraq was not racial within the contemplation of § 1981 because it pitted Caucasian against Caucasian. In rejecting that narrow reading of the racial discrimination prohibited by the statute (and obviously by the Fourteenth Amendment as well), the Supreme Court treated as critical the understanding of the framers when they took steps to forbid discrimination on the basis of race. The Supreme Court pointed out that § 1981 "had its source in the Civil Rights Act of 1866 ... as well as the Voting Rights Act of 1870." Its investigation into original intent has great significance for *Batson v. Kentucky*, because the very congressmen who passed the Civil Rights Act of 1866 proposed, on June 13, 1866, the Fourteenth Amendment to the states for ratification.

The Fourteenth Amendment and the Civil Rights Act were not only written by the same senators and representatives in the same Congressional session; they were closely related in purpose as well. "The Civil Rights Act was critically important; the rights declared in section one of the Act were virtually identical to those eventually embodied in the Fourteenth Amendment." J. Nowak, R. Rotunda & J. Young, *Handbook on Constitutional Law* 543 (1978). Indeed, lingering doubts about the authority of Congress to

act as it did in passing the Civil Rights Act of 1866 "gave impetus to the movement for another, clearer Amendment to the Constitution [the Fourteenth]." *Id.* at 543–544. Opponents of the Fourteenth Amendment criticized it specifically because it "constitutionalized" the Civil Rights Act of 1866. *Id.* at 546 n. 24. It is beyond dispute that "race" meant the same thing to the draftsmen of the equal protection clause that it meant to the draftsmen of the Civil Rights Act.

What, then, did "race" mean to those national legislators of 1866? *Saint Francis College v. Al-Khazraji,* in looking to that original understanding, pointed out that the issue is not what present-day geneticists, demographers, and scientists mean by the term "race" but what the framers of the law understood that term to embrace in 1866:

"Petitioner's submission rests on the assumption that all those who might be deemed Caucasians today were thought to be of the same race when § 1981 became law in the 19th century; and it may be that a variety of ethnic groups, including Arabs, are now considered to be within the Caucasian race. The understanding of 'race' in the 19th century, however, was different. Plainly, all those who might be deemed Caucasian today were not thought to be of the same race at the time § 1981 became law."

In ascertaining the original understanding, the Court cited numerous dictionary definitions of the term "race" throughout the 19th century. It then went on to explore what 19th century encyclopedias had had to say upon the subject:

"Encyclopedias of the 19th century also described race in terms of ethnic groups, which is a narrower concept of race than petitioners urge. Encyclopedia Americana in 1858, for example, referred ... to various races such as Finns, ... gypsies, ... Basques, ... and Hebrews.... The 1863 version of the New American Cyclopaedia divided the Arabs into a number of subsidiary races ...; represented the Hebrews as of the Semitic race ..., and identified numerous other groups as constituting races,

including Swedes, ... Norwegians, ... Germans, ... Greeks, ... Finns, ... Italians, ... Spanish, ... Mongolians, ... Russians, ... and the like. The Ninth edition of the Encyclopedia Britannica also referred to Arabs, ... Jews, ... and other ethnic groups such as Germans, ... Hungarians, ... and Greeks, ... as separate races." (Citations omitted).

It concluded that discussion of the published source books with the observation:

"These dictionary and encyclopedic sources are somewhat diverse, but it is clear that they do not support the claim that for the purposes of § 1981, Arabs, Englishmen, Germans and certain other ethnic groups are to be considered a single race."

The Supreme Court then probed the minds of the legislators and framers (the Congress of 1866) by listening to the words used by those senators and representatives themselves in various debates on various bills during the 1866 Session:

"The debates are replete with references to the Scandinavian races, ..., as well as the Chinese, ... and Anglo-Saxon races.... Jews, ... Mexicans, ... blacks, ... and Mongolians ... were similarly categorized. Gypsies were referred to as a race.... Likewise, the Germans....

. . . . .

There was a reference to the Caucasian race, but it appears to have been referring to people of European ancestry."

What the Supreme Court concluded with respect to the intent of the framers of the Civil Rights Act of 1866 would apply, with equal force, to the intent of the framers of the equal protection clause, who were the same people dealing with the same problem in the same session:

"Based on the history of § 1981, we have little trouble in concluding that Congress intended to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of

their ancestry or ethnic characteristics. Such discrimination is racial discrimination that Congress intended § 1981 to forbid, whether or not it would be classified as racial in terms of modern scientific theory."

The companion case to *Saint Francis College v. Al-Khazraji* was *Shaare Tefila Congregation v. Cobb,* —— U.S. ——, 107 S.Ct. 2019, 95 L.Ed.2d 594 (1987). Although that case dealt with § 1982, a companion statute to § 1981, the Supreme Court held their legislative histories, tracing to the Civil Rights Act of 1866, to be indistinguishable. The section guaranteed to all citizens of the United States "the same right ... as is enjoyed by white citizens ... to inherit, purchase, lease, sell, hold, and convey real and personal property." The Court of Appeals for the Fourth Circuit had held that the suit for a violation of § 1982 was properly dismissed "[b]ecause discrimination against Jews is not racial discrimination." In reversing the Fourth Circuit, the Supreme Court concluded:

"Our opinion in that case [*Saint Francis College v. Al-Khazraji*] observed that definitions of race when § 1982 was passed were not the same as they are today and concluded that the section was 'intended to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics.' ... It is evident from the legislative history of the section reviewed in *Saint Francis College,* a review that we need not repeat here, that Jews and Arabs were among the peoples then considered to be distinct races and hence within the protection of the statute. Jews are not foreclosed from stating a cause of action against other members of what today is considered to be part of the Caucasian race."

When *Batson* is read in conjunction with *Saint Francis College v. Al-Khazraji* and *Shaare Tefila v. Cobb* (one must put on blinders not to do so), the limits of the combined logic are so far-flung as to be virtually limitless. This is without even considering the discriminatory use of peremptory challenges based upon sex or upon religion.

There may be much merit in Justice Marshall's conclusion, in his concurring opinion in *Batson,* that there is no feasible way of administering the protection short of the total abolition of the peremptory challenge. To hold that, in the jury selection process, the equal protection clause is available only to black defendants deprived of black jurors is philosophically indefensible. Once the protection is moved beyond that narrow base, however, there is no logically defensible way to contain it. Between the absolute abolition of the peremptory challenge, on the one hand, and the absolute refusal to look behind the unfettered use of the peremptory challenge, on the other hand, there may be no tenable middle ground.

### The Unresolved Final Summation

Has the Supreme Court in *Batson* given us an *ad hoc* solution to a particular, albeit grave, social problem? Or has it given us a neutral constitutional principle? What does a court do when a course of action is at once logically untenable but sociologically imperative? Perhaps it issues a deliberately ambiguous opinion, unquestionably dealing with the sociologically imperative problem but remaining carefully vague about the further reach of its principles. It may then "buy time" by denying *certiorari.*

In terms of doctrinal integrity, the Supreme Court in *Batson v. Kentucky* may have "caught a Tartar." In any event, the observation of Justice White appears prophetic:

"Much litigation will be required to spell out the contours of the Court's Equal Protection holding today." 476 U.S. at ——, 106 S.Ct. at 1725, 90 L.Ed.2d at 91 (White, J., concurring). Fortunately, the far-flung repercussions of *Batson* are not before us in this case.

### The Remaining Contentions

Because one of the options available on limited remand is to reaffirm the judgments as they now stand, it will be necessary for us to address the appellant's other contentions. Fortunately, they are less cosmic than his first.

*Alleged Comment on the Appellant's Right to Silence*

In the course of the prosecutor's opening statement to the jury, the following exchange occurred:

"Once you are led to that conclusion that the defendant was at the crime scene the second question I think you have to answer is what happened when they were there. I'm not going to lie to you. I don't know. I think there are two people in the world who know what happened that night.

One of them is unable to testify. It is our contention—

Mr. Roberts: Objection, Your Honor.

The Court: Objection overruled.

Mr. Sengstack: One of them is unable to testify. The second one sits at that counsel table right there."

After the opening statements had been concluded, the appellant moved for a mistrial, which was denied. In the alternative, the appellant asked for a curative instruction, which was also denied.

The appellant claims that this reference to him as the only surviving witness to the crime represents a constitutionally forbidden comment upon his right to silence.

Recognizing the broad discretion available to the trial judge in handling such matters, we cannot say that Judge Bowling abused his discretion in concluding that this was not a comment upon the appellant's silence. If it conceivably was, it was at most indirect rather than direct. As we pointed out in *Funkhouser v. State,* 51 Md.App. 16, 29–30, 440 A.2d 1114 (1982), "[N]ot every neutral or indirect reference that the State makes which implicitly refers to a defendant's silence is improper comment." *See also Johnson v. State,* 9 Md.App. 327, 333–334, 264 A.2d 280 (1970).

We read the reference as primarily connoting that the appellant was at the crime scene, the very issue which the State was obligated to prove. We note, moreover, that the State, during the opening statement, had no idea whether the appellant would ultimately testify or not. In any event, a passing reference at the very outset of the trial is not the

equivalent of an argumentative summation at the conclu-
sion of the trial and the whole point strikes us as an
opportunistic triviality.

## The Legal Sufficiency of the Evidence

The appellant does not attack the legal sufficiency
of the evidence to establish his homicidal agency. The
challenge to the legal sufficiency of the evidence is confined
to the sexual aspect of the charges. The appellant claims
specifically that the evidence was not enough to support a
reasonable conclusion that there was either an attempted
rape in the first degree (in any degree, for that matter) or a
third-degree sexual offense. From that, he argues further
that there was no evidence to support a conviction for
felony-murder where the undergirding attempted felony
was rape in the first degree.

We do not agree. When the body of 14–year-old Tricia
Lee Stephens was found at an abandoned sawmill, it was
nude from the waist down except for a pair of socks. Her
arms were extended above her head, with her brassiere, her
shirt, and her coat (the murder occurred on January 1)
pulled up above her breasts and around her neck. Under
virtually indistinguishable facts, we held in *Hines v. State*,
58 Md.App. 637, 665–666, 473 A.2d 1335 (1984), that from
the posture of the body and the arrangement of the clothing
alone, the inference is permitted that the attack was sexual-
ly motivated:

"The fact that [the victim's] body was nude; that her
halter top was over her face and the rest of her clothing
was piled beside her; that she was lying on her back with
her legs spread apart gives rise to permissible inferences
that (a) there had been a sexual touching without her
consent and (b) that her assailant intended to rape when
he attacked her. It is true that other inferences might be
drawn from the same facts; but despite frequent expres-
sions to the contrary, circumstantial evidence may be
sufficient to support a conviction even if the circumstanc-

es do not exclude every hypothesis consistent with innocence. . . .

. . . . .

Finally, the existence of the weapon that was used to kill [the victim] is a circumstance sufficient to raise the necessary inference that the inferred attempted rape constituted an attempted rape in the first degree."

In that case, as here, the lack of trauma to the victim's anal or genital area and the lack of presence of sperm on the body did not negate the permitted finding of a sexual purpose for the attack. Such facts would indicate, at most, that the sexual purpose was only attempted and not consummated.

The appellant attacks legal sufficiency on a second theory. Even granting the existence of a sexual purpose on his part, he claims that there was no legally sufficient evidence to permit the finding that Tricia Lee Stephens did not fully consent to the sexual encounter. Granting a sexual purpose, the physical circumstances permit the inference that the modality was violence and not consent. The suggestion that the victim voluntarily prepared for sexual contact by pulling her brassiere, shirt, and coat up around her neck instead of taking them off is bizarre. It is preposterous to suggest that she removed her own pants and panties when the right pants leg was turned inside out and the right leg of her panties was around this pants leg. Even more to the point, the pants and panties, covered with debris, were found lying in a nearby puddle. A person planning to dress again and return home does not voluntarily deposit her clothing in a puddle of water.

There was a bruise, moreover, on the victim's hand which the medical examiner testified was a defense-type wound. There was human flesh on her left leg. There were leaves and sawdust clinging to her body, in her navel, and between her legs. She had been beaten with both a fist and a board. The cause of death was manual strangulation.

Under all of the circumstances, it was not unreasonable for the jury to conclude that the appellant had a sexual purpose in mind and that the appellant used violence in an attempt to achieve that purpose.

### *Denial of Subpoena to Require State's Witness to Furnish Sample of Pubic Hair*

The appellant filed a motion pursuant to Rule 4–264 for the court to issue a subpoena to State's witness William Nims directing him to provide samples of his pubic hair. The defense wanted to subject these samples to examination by their own expert to see if they were compatible with combings of Caucasian pubic hair found in the pubic hair of the victim. William Nims had been the boyfriend of the murder victim. The defense theory of the case was that William Nims, and not the appellant, was the murderer. The defense, however, offered no evidence in that regard sufficient to raise it beyond the level of bare and unsubstantiated speculation.

Judge Bowling declined to issue the subpoena. Quite aside from the lack of any demonstrated relevance, Judge Bowling concluded that, absent probable cause, he had no such power. Rule 4–264 provides:

> "On motion of a party, the circuit court may order the issuance of a subpoena commanding a person to produce for inspection and copying at a specified time and place before trial designated documents, recordings, photographs, or other tangible things, not privileged, which may constitute or contain evidence relevant to the action. Any response to the motion shall be filed within five days."

This clearly requires the State, or even other persons, to furnish existing documents, recordings, photographs, and other tangible evidence for inspection. It does not authorize subjecting a human being to physical examination, such as the furnishing of pubic hair, a blood sample, a voice exemplar, etc. There are Fourth Amendment protections in any citizen against such intrusions that may be breached

only by a demonstration of probable cause, which the appellant did not demonstrate here. He has offered us no authority that Rule 4–264 has ever been used for a purpose such as that which he here suggests and we know of none. We see no error.

### *Limiting the Impeachment of the Credibility of William Nims*

The appellant sought, on the cross-examination of William Nims, to develop the fact that in 1983 Nims, as a juvenile, had been charged with the sexual abuse of a six-year-old girl. Nims was found guilty of simple assault and battery and not of any sexual charges. The appellant sought to explore the circumstances of that alleged sexual abuse. Judge Bowling did not permit it.

The basic Maryland law is that the conviction for assault and battery is not relevant to the question of the witness's credibility. *State v. Duckett,* 306 Md. 503, 510 A.2d 253 (1986). Basically, nothing short of conviction is permitted for impeachment purposes. *But see Ogburn v. State,* 71 Md.App. 496, 526 A.2d 614 (1987). Among the many reasons for this is that it would involve a "trial within a trial" as to the very existence of the circumstances. *Davis v. Alaska,* 415 U.S. 308, 316–317, 94 S.Ct. 1105, 1110–1111, 39 L.Ed.2d 347 (1974), does not help the appellant, because there it was not the fact of a juvenile adjudication (which we do not even have in this case) that was held to be admissible by the Supreme Court. The *Davis v. Alaska* holding was limited to the fact that a defendant may show bias on the part of a State's witness, in that case demonstrated by the fact that the juvenile witness was still on probation. In the present case, Nims was not on probation at the time of the appellant's trial.

To the extent to which *State v. Cox,* 298 Md. 173, 179–181, 468 A.2d 319 (1983), is not *sui generis* and will, therefore, be confined to its own facts, Nims's situation did

not approach that which was before the Court in *Cox*. In that case, there had been prior false reports of rape by the alleged rape victim. That situation went directly to truth and veracity. Here, even evidence of sexual abuse would not bear directly on the character of the abuser as a truth-speaker. Clearly, it was a "red herring" which might have been given significance by the jury for extrinsic purposes far afield from that of assessing credibility. We hold that Judge Bowling did not abuse his discretion in ruling that evidence of prior bad acts, not leading to a conviction or an adjudication of delinquency, was not admissible.

### *Exclusion of Irrelevant Testimony*

The appellant attempted to offer the testimony of LaDonna Venis ostensibly to show that Tricia Lee Stephens was going to go to a Christmas party with a boy other than her boyfriend, William Nims. Among many difficulties with the proposed testimony was that LaDonna Venis could not remember what the defense wanted her to say. She was used, therefore, merely to authenticate her authorship of some letters to the victim which were found in the victim's pocket. LaDonna Venis couldn't remember why she referred to such matters in her letters and had no independent recollection whatsoever of any romantic troubles between the victim and her boyfriend. There was no suggestion that the letters represented past recollection recorded. They were not only irrelevant, they were also incompetent. We see no abuse of discretion in Judge Bowling's having ruled them inadmissible.

JUDGMENTS VACATED AND CASE REMANDED FOR FURTHER PROCEEDINGS; IF COURT FINDS NO EQUAL PROTECTION VIOLATION, JUDGMENTS ARE AFFIRMED; IF COURT FINDS AN EQUAL PROTECTION VIOLATION, JUDGMENTS ARE REVERSED AND CASE TO BE RETRIED ON THE MERITS; COSTS TO BE PAID BY CHARLES COUNTY.