Charlie WAMGET, Appellant,

v.

The STATE of Texas.

No. 926–00.

Court of Criminal Appeals of Texas.

Sept. 12, 2001.

Charles Freeman, Houston, for Appellant.

Alan Curry, Asst. DA, Houston, Matthew Paul, State's Atty., Austin, for State.

## OPINION

PER CURIAM.

Appellant was convicted of murder and sentenced to sixteen years imprisonment. On appeal he claimed the trial court abused its discretion in overruling a *Batson* challenge. The Court of Appeals affirmed. *Wamget v. State*, No. 14–96–01188–CR slip op., 1999 WL 672327 (Tex. App.—Houston [14th Dist.] Aug.31, 1999)(not published). We granted appellant's petition for discretionary review to decide whether the Court of Appeals erred in holding that race may be a factor co-existing with a non-racial reason as long as race is not the only reason for the strike.[1] We begin by addressing the question of whether it was established that "race" was even a factor underlying the peremptory strike, apart from the further question of its coupling with a non-racial reason. *See* n. 10, *infra.*

During voir dire examination, the State used a peremptory challenge against Venireperson No. 38. Appellant objected to the strike as being impermissibly race-based under *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The prosecutor gave the following reasons

---

**1.** We also granted review of appellant's second and third points of error, but upon further consideration have decided that those grounds were improvidently granted.

for the exercise of the peremptory challenge against Venireperson No. 38:

> No. 38 also spoke up much more during [defense counsel's] voir dire. Also she was born in—according to her jury card, born in Liberia. Let me double-check that.
>
> Under the circumstances that gave me some concern. She also is not employed at this time and that gave me some concern.

Appellant argued that the prosecutor's reference to Liberia was an improper reason for exercising a strike under *Batson*.[2] The trial court overruled the challenge.

On direct appeal, appellant claimed the trial court "committed reversible error by overruling appellant's article 35.261 objection." Appellant argued that reliance on a venireperson's nationality "is so absolutely unconstitutionally offensive as to override any other purportedly race-neutral excuse." He further argued that "whenever a party exercised a peremptory challenge against a venireperson even partially because of his or her race or national origin, such peremptory challenge is unconstitutional." The State argued that appellant's claim should be rejected because the State's strike was not racially motivated.[3]

The Court of Appeals rejected appellant's claim concerning the venireperson's national origin:

> The Court of Criminal Appeals has held that race may be a factor co-existing with a non-racial reason; however, race may not be *the* reason for the strike. *See Hill [v. State]*, 827 S.W.2d [860] at 866 [Tex.Crim.App.1992]. Because there is no evidence in the record that race was the reason for the State's strike, we cannot hold that the trial court's decision to overrule appellant's *Batson* challenge regarding Juror 38 was clearly erroneous.

*Wamget,* No. 14–96–1188 slip op. at 7.

Appellant urges this Court to hold that when the reasons given for a peremptory strike implicate a congenital classification such as national origin, the taint arising from the invalid reason cannot be removed by combination with reasons that do not implicate congenital or suspect classifications. The State maintains that "race" was not a given reason for the strike against Venireperson No. 38 and that the Court of Appeals did not hold that race was a reason for the strike in this case. Essentially, the State says the fact that

---

**2.** Appellant argued against the State's proffered race-neutral reasons as follows:

> That's a ruse with respect to No. 38, because if you go back through-I am asking the Court to take *judicial notice* and I am *offering* into evidence a copy of the juror information form.... With that in mind then, I would point out to the Court there are several jurors that are not employed.... With respect to the Liberia situation ... In respect to Liberia, I didn't ask no questions, didn't ask the juror be brought forward to question her about the nationality issue. In fact, it's not only a ruse, *it would be improper to have struck someone* based on nationality, particularly aware of the individual that was, that there was no question asked as to whether that person was a citizen or whatever. It would either be a violation of Peter v. State (sic) and all of the

other long line of cases that allow a person who have divergent original nationalities who subsequently become citizens to serve on juries. And so with that in mind I am asserting that the reasons that have been proffered by the State are shams and pretext....

**3.** The State maintained that there might be a proper reason to strike someone because of where they were born or where they are from:

> A prospective juror who is from New York may be struck because he or she is used to seeing violence. The violence that has taken place in Liberia in recent years dwarfs that seen in New York. [Venireperson No. 38] was not struck because she was a Liberian but rather because she was "born in Liberia," and thus may have been more used to seeing violence.

Prospective Juror No. 38 was born in Liberia is a race-neutral reason for the prosecutor's use of a peremptory strike. For this reason, the State argues, the Court of Appeals properly held that "there is no evidence in the record that race was the reason for the State's strike." Only if we hold that the country of one's birth is not a race-neutral reason for exercising a peremptory strike, do we reach the question of whether its combination with two race-neutral reasons is violative of *Batson*.[4]

I.

It is more than settled that exclusion from jury service because of ethnicity or nationality violates the Equal Protection Clause. *See Hernandez v. Texas,* 347 U.S. 475, 477–78, 74 S.Ct. 667, 98 L.Ed. 866 (1954)(in case involving exclusion of venirepersons of Mexican descent, Court rejected State's argument that only two classes, "white and Negro," were within contemplation of Fourteenth Amendment and stated that "exclusion of otherwise eligible persons from jury service solely because of their ancestry or national origin is discrimination prohibited by the Fourteenth Amendment"); *United States v. Chalan,* 812 F.2d 1302, 1314 (10th Cir.1987)(recognizing striking of American Indians on account of race would violate *Batson* and Equal Protection Clause), *cert. denied,* 488 U.S. 983, 109 S.Ct. 534, 102 L.Ed.2d 565 (1988); *State v. Rigual,* 256 Conn. 1, 771 A.2d 939, 945 (2001)("[d]iscrimination on the basis of ancestry or national origin violates the Equal Protection clause of the federal constitution [and][c]onsequently, *Batson,* which was decided on the basis of the Equal Protection clause, must be applied to protect venirepersons from being excused from juries because of their ancestry or national origin"); *State v. Alen,* 616 So.2d 452 (Fla.1993)(recognizing Hispanics as a protected class under Equal Protection Clause, and exclusion of Hispanic venireperson for reason that was not race-neutral violated *Batson* ); *State v. Rambersed,* 170 Misc.2d 923, 649 N.Y.S.2d 640, 642 (N.Y.Sup.Ct.1996)(Italian–Americans are cognizable group under *Batson* and Equal Protection Clause); *see also Hernandez v. New York,* 500 U.S. 352, 355, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991)(recognizing that exclusion of Latinos from jury based on ethnic origin would violate Equal Protection Clause); *see also United States v. Martinez Salazar,* 528 U.S. 304, 315, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000)(stating that "under the Equal Protection Clause, a defendant may not exercise a peremptory challenge to remove a potential juror solely on the basis of the juror's gender, ethnic origin, or race"); *Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498

---

**4.** Objecting at trial to the State's use of a peremptory strike against Venireperson No. 38 and the use of peremptory strikes against a number of other potential jurors, appellant stated that the strikes "violate Article 35.26(1) of the Texas Code of Criminal Procedure as well as in the alternative it violates Batson versus Kentucky, the federal perception, Equal Protection under the law, the 14th Amendment of the United States Constitution, impermissible selection of jurors based upon race." On direct appeal, appellant claimed the trial court "committed reversible error by overruling appellant's article 35.261 objection." Appellant relied on language from the Texas Constitution in support of his argument that nationality is not a permissible reason for the strike. TEX. CONT. art. I, sec. 3a ("Equality under the law shall not be denied or abridged because of sex, race, color, creed or national origin"). Appellant did not rely on the federal constitution or *Batson* in support of his claim before the Court of Appeals. Nonetheless, the Court of Appeals analyzed the issue under *Batson* and appellant does not take issue with this aspect of its opinion. Because we are reviewing the decision of the Court of Appeals, we are limited to addressing the question under *Batson*.

(1977)(holding Mexican Americans cognizable racial group for purposes of Equal Protection analysis under *Swain v. Alabama*).

Indeed, ethnicity and nationality are probably more precisely what is meant by the term "race" for purposes of the Equal Protection Clause. In *Saint Francis College v. Al Khazraji*, 481 U.S. 604, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987), the United States Supreme Court equated race discrimination with discrimination based on ethnic origin, holding them essentially interchangable for purposes of an action under 42 U.S.C. § 1981.[5] Respondent in that case, a United States citizen born in Iraq, was denied tenure by Saint Francis College. Respondent sued the college under 42 U.S.C. § 1981, alleging discrimination based on national origin, religion and/or race. The Supreme Court granted certiorari to decide whether "a person of Arabian ancestry was protected from racial discrimination under § 1981." *Id.* at 607, 107 S.Ct. 2022.

Section 1981 had previously been construed by the Court as prohibiting "racial discrimination" in the making of contracts. The issue in *Saint Francis College* was whether the respondent had alleged racial discrimination within the meaning of § 1981. To answer this question, the Court examined the understanding of "race" in the 19th century by looking to dictionaries and encyclopedias from that period:

In the middle years of the 19th century, dictionaries commonly referred to race as a "continued series of descendants from a parent who is called the *stock*," N. Webster, An American Dictionary of the English Language 666 (New York 1830) (emphasis in original), "the lineage of a family," 2 N. Webster, A Dictionary of the English Language 411 (New Haven 1841), or "descendants of a common ancestor," J. Donald, Chambers' Etymological Dictionary of the English Language 415 (London 1871). The 1887 edition of Webster's expanded the definition somewhat: "The descendants of a common ancestor; a family, tribe, people or nation, believed or presumed to belong to the same stock." N. Webster, Dictionary of the English Language 589 (W. Wheeler ed. 1887). It was not until the 20th century that dictionaries began referring to the Caucasian, Mongolian, and Negro races.... Even so, modern dictionaries still include among the definitions of race, "a family, tribe, people, or nation belonging to the same stock." Webster's Third New International Dictionary 1870 (1971); Webster's Ninth New Collegiate Dictionary 969 (1986). Encyclopedias of the 19th century also described race in terms of ethnic groups ... Encyclopedia Americana in 1858, for example, referred to various races such as Finns, vol. 5, p. 123, gypsies, 6 *id.*, at 123, Basques, 1 *id.*, at 602, and Hebrews, 6 *id.*, at 209.

*Saint Francis College*, 481 U.S. at 610–11, 107 S.Ct. 2022. Other examples of "races" given in various editions of 19th century encyclopedias included Swedes, Norwe-

---

**5.** Section 1981 provides:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to the punish-ment, pains, penalties, taxes, licenses, and exactions of very kind, and to no other. Although § 1981 does not refer to the term "race," the Supreme Court has construed it to prohibit all "racial discrimination" in the making of private and public contracts. *Runyon v. McCrary*, 427 U.S. 160, 166, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976).

gians, Germans, Greeks, Finns, Italians, Spanish, Mongolians, Russians, Jews, and Hungarians. *Id.* The Court further pointed out that the congressional debates of the time were "replete with references to the Scandinavian races ... the Chinese, ... Latin, ... Spanish, ... and Anglo Saxon races, ... Jews, ... Mexicans, ... blacks, ... and Mongolians ..., Gypsies ... [and] the Germans." *Id.* at 612, 107 S.Ct. 2022. Based on the above evidence of society's view of "race" at the time, the Supreme Court concluded that Congress intended to prohibit discrimination due to a person's ancestry or ethnic characteristics under § 1981. The Court stated that "such discrimination is racial discrimination that Congress intended § 1981 to prohibit, whether or not it would be classified as racial in terms of modern scientific theory." *Id.* at 613, 107 S.Ct. 2022.

The Supreme Court's analysis concerning races in *Saint Francis College* has been applied in the Equal Protection/*Batson* context. *See United States v. Biaggi*, 673 F.Supp. 96, 101 (E.D.N.Y.1987), *aff'd*, 853 F.2d 89 (2nd Cir.), *cert. denied*, 489 U.S. 1052, 109 S.Ct. 1312, 103 L.Ed.2d 581 (1989); *Rambersed*, 649 N.Y.S.2d at 644. Some courts have determined that the legislative history of post-civil war legislation, including the enabling legislation of the Equal Protection Clause of the Fourteenth Amendment, supports the view that the Fourteenth Amendment "was intended to protect a variety of groups not now labeled 'races.' " [6] *Biaggi*, 673 F.Supp. at 102; *see also Rambersed*, 649 N.Y.S.2d at 644 ("[i]n light of the dialectic historical realities, it can assuredly be concluded that for Equal Protection jurisprudence *Batson* supports an expansive construction of the meaning of 'cognizable racial group' that is inclusive of a variety of ethnic and ancestral groups subject to intentional discrimination"); *Chew v. State*, 71 Md.App. 681, 527 A.2d 332, 348 (1987)(Fourteenth Amendment and Civil Rights Act of 1866 were written by same senators and representatives in same congressional session), *vacated*, 317 Md. 233, 562 A.2d 1270 (1989). As explained by one court with particularity:

> A cursory review of the relevant sociological and anthropological literature reinforces, rather than undermines, the often invisible link between race and national origin, emphasizing such factors as geographic distribution and culture in race formation....
>
> Turning to the legislative history of America's first Civil Rights Act, that of

6. Many courts use the terms "race" and "ethnicity" or "national origin" interchangeably for purposes of *Batson,* without discussing the meaning and scope of the term "race" under *Batson* and the equal protection clause. *Hernandez,* 500 U.S. at 355, 111 S.Ct. 1859 (suggesting that if State used peremptory challenges to exclude Latinos from jury due to ethnic origin, it would violate Equal Protection Clause under *Batson* and referring throughout opinion to examining "race" neutrality of State's explanation in context of alleged discriminatory exclusion from jury of Latinos); *United States v. Bedonie,* 913 F.2d 782, 795 (10th Cir.1990)(referring to members of Navajo Tribe as members of "recognizable racial group" under *Batson* ), *cert. denied,* 501 U.S. 1253, 111 S.Ct. 2895, 115 L.Ed.2d 1059 (1991); *Pemberthy v. Beyer,* 19 F.3d 857, 870 (3rd Cir.1994)(stating "We believe that Batson does not apply to peremptory challenges unless they are based on classifications, such as race or national origin, that are subject to 'strict' scrutiny under equal protection doctrine"), *cert. denied,* 513 U.S. 969, 115 S.Ct. 439, 130 L.Ed.2d 350 (1994); *United States v. Canoy,* 38 F.3d 893 (7th Cir.1994)(using terms "racial," "national origin" and "ethnic minorities" interchangeably in addressing *Batson*-based claim regarding exclusion of Asian venireperson); *Rigual,* 771 A.2d at 944 (holding *Batson* applicable to prohibit use of peremptory challenges on basis of ethnic origin or ancestry); *Pemberthy,* 800 F.Supp. at 156 n. 13 ("[t]his court will follow the *Batson* and Equal Protection jurisprudence, which uses the terms 'race' and 'ethnicity' interchangeably").

1866, which was enacted to further the protections of the Thirteenth Amendment (1865), finds it replete with references to a broad scope encompassing "all persons".... "[T]he statutory structure and legislative history persuade ... that the 39th Congress was intent upon establishing ... a broader principle then would have been necessary simply to meet the particular and immediate plight of the newly freed Negro slaves." Likewise, the legislative history of the Fourteenth Amendment (1868) illustrates beyond doubt that the amendment was designed to insure that the 1866 Act's principles enjoyed constitutional validity.

Following ratification of the Fifteenth Amendment (1870), Congress passed the Enforcement Act of 1870, essentially reenacting the 1866 statute and making clear its ambit extended to nationality groups.

The legislative history of major 19th century civil rights enactments "embrace[s], at the least, membership in a group that is ethnically ... distinctive...."

*Rambersed,* 649 N.Y.S.2d at 644 (citations omitted). The lower court's opinion in *Saint Francis College* demonstrated the historical connection between the Fourteenth Amendment and § 1981:

Section 1981 was originally enacted as part of Section 1 of the Civil Rights act of 1866, authorized by Section 2 of the thirteenth amendment to the United States Constitution. Because of doubts over Congress' authority to pass the Civil Rights Act of 1866, it was subse-

quently reenacted following the adoption of the fourteenth amendment as Section 18 of the Civil Rights Act of 1870.... Accordingly, Section 1981 has some ties to the fourteenth as well as to the thirteenth amendments.

*Al–Khazraji v. Saint Francis College,* 784 F.2d 505, 515 (3rd Cir.1986), *aff'd,* 481 U.S. 604, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987); *see also Chew,* 527 A.2d at 349 (what Supreme Court concluded with respect to intent of framers of Civil Rights Act of 1866 would apply with equal force to intent of framers of Equal Protection Clause, who were same people dealing with same problem during same congressional session).

■ Accordingly, we agree that the notion of "race" ought to be as broadly understood for purposes of *Batson* and the Equal Protection Clause as it is has been interpreted by the Supreme Court in the context of other post-civil war legislation such as Section 1981. *See Saint Francis College,* 481 U.S. at 613, 107 S.Ct. 2022; *see also Salazar v. State,* 795 S.W.2d 187, 193 (Tex.Crim.App.1990)(referring to Hispanics as "race" for purposes of establishing cognizable racial group under *Batson* ). We hold that "race," for purposes of *Batson,* encompasses notions of ancestral line and ethnicity. And discrimination based on such considerations is racial discrimination under *Batson.*

■ But this broad understanding of race carries with it a burden on the party making the *Batson* claim, to establish the ethnicity of the person in question and show he is a member of a cognizable racial group.[7] *See United States v. Campione,*

---

**7.** One state supreme court has held that in order to show cognizability as to an ethnic group, the challenging party must show the group:

(1) is defined and limited by some clearly identifiable factor or factors; (2) possesses

a common thread of attitudes, ideas or experiences; (3) shares a community of interests such that the group's interest cannot be adequately represented if the group is excluded from the jury selection process; and, (4) has experienced or is experiencing

942 F.2d 429, 433 (7th Cir.1991)("spelling of person's surname is insufficient—standing alone—to show that he or she belongs to a particular ethnic group"). This is a prerequisite to making a *prima facie* case, and, in any case, is part of the burden of persuasion in showing purposeful discrimination.[8] The further question presented in the instant case is whether the country of one's birth place is a sufficient ground on which to establish a person's ethnicity for purposes of making a *Batson* claim based on ethnicity.

## II.

The Supreme Court has emphasized that a person's ethnicity or ancestry does not equate with the country where he was born. In the second to last sentence of its opinion in *Saint Francis College*, the Court stated: "If respondent on remand can prove that he was subjected to intentional discrimination *based on the fact that he was born an Arab, rather than solely on the place or nation of his origin*, or his religion, he will have made out a case under § 1981." *Saint Francis College*, 481 U.S. at 613, 107 S.Ct. 2022 (emphasis added). Thus, the Court distinguished between discrimination based solely on the country where one was born, which would not be viewed as race discrimination, and discrimination based on one's ancestral line or ethnicity, which would constitute race discrimination. In a concurring opinion, Justice Brennan pointed out that "the line between discrimination based on 'ancestry or ethnic characteristics' ... and discrimination based on 'place or nation of ... origin,' ... is not a bright one":

> It is true that one's ancestry—the ethnic group from which an individual and his or her ancestors are descended—is not necessarily the same as one's national origin—the country "where a person was *born*, or, more broadly, the country

---

discriminatory treatment and is in need of protection from community prejudices.

*Commonwealth v. Rico*, 551 Pa. 526, 711 A.2d 990, 994 (1998). Another court stressed the importance of the moving party to state on the record the relevant facts upon which it relies in identifying someone as a member of an allegedly cognizable racial group:

> Visual observations, along with other criteria, such as surnames, language, etc., developed during *voir dire*, undoubtedly are utilized in connection with identifying members of cognizable racial or ethnic groups.... When, based on such observations and criteria, a party states, as a fact, his or her conclusion concerning the composition of the venire or that a particular venireperson is a member of a group, against whom the party alleges peremptory challenges are being discriminatorily used, and, the other side, being aware of the critical criteria and having had the opportunity to make similar observations, does not challenge that assertion, the fact will be deemed established.
> ... Setting out in the record, in detail, the bases for reaching the conclusion that a particular person is a member of a particu-

lar ethnic or racial group is critical. The statements of the moving party's conclusion should also enumerate the observations and assumptions upon which the conclusion is based. The more detailed the statement, the greater the incentive it provides the striking party to state any disagreement it may have. For example, if the moving party notes an accent and a general appearance, which indicates, to the moving party, that the venireperson is Hispanic, the other side, having the benefit of those details and having been apprised of the precise characteristics which prompted the conclusion, will be hard pressed not to note any differences it may have with the moving party without, in the process, conceding the issue.

*Mejia v. State*, 328 Md. 522, 616 A.2d 356, 362–63 & n. 8 (1992).

**8.** In making a *prima facie* case, it must be shown that the venire person in question is a member of a cognizable racial group. *Batson*, 476 U.S. at 96, 106 S.Ct. 1712 (to establish *prima facie* case of purposeful discrimination, defendant first must show prospective juror is member of cognizable racial group).

from which his or her ancestors came." Often, however, the two are identical as a factual matter: one was born in the nation whose primary stock is one's own ethnic group. Moreover, national origin claims have been treated as ancestry or ethnicity claims in some circumstances. For example, in the Title VII context, the terms overlap as a legal matter. See *29 CFR § 1606.1* (1986) (emphasis added) (national origin discrimination "includ[es], but is not limited to, the denial of equal employment opportunity because of an individual's, or his or her ancestor's, place or origin; or because an individual has the physical, cultural, or linguistic characteristics of a national origin group") *Espinoza [v. Farah Manufacturing Co.], supra,* [414 U.S. 86] at 89 [94 S.Ct. 334, 38 L.Ed.2d 287 (1973)] (the deletion of the word ancestry from the final version of § 703 of Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e–2(e),* "was not intended as a material change, . . . suggesting that the terms 'national origin' and 'ancestry' were considered synonymous"). I therefore read the Court's opinion to state only that discrimination based on *birthplace alone* is insufficient to state a claim under § 1981.

*Saint Francis College,* 481 U.S. at 614, 107 S.Ct. 2022 (Brennan, J., concurring) (emphasis in original).

■ Justice Brennan was exactly right in pointing out that ethnicity and national origin or, more specifically, the country where one was born, are often not necessarily the same. *See Alen,* 616 So.2d at 455 ("[N]ational origin is an important, but not a decisive, factor in determining a person's ethnicity"). This is increasingly true in today's rapidly expanding global society. A person of any ethnic background and/or color may be born in any country of the world without necessarily

inheriting that country's predominate ethnicity. Ethnicity is based more on ancestral lineage than the country where one was born, which may or may not be the country of one's ancestors. Thus, the country of one's birth, standing alone, is race-neutral. While it may be an *indication* of ethnicity, more would be needed. We hold that the party alleging discrimination based on nationality or ethnicity under *Batson* will not adequately establish the venireperson's ethnicity and cognizable racial group by showing only the country of their birth, and such party will likewise fail to meet its burden of persuasion of race discrimination by showing that the peremptory strike was based only on the country of the venireperson's birth. *See Purkett v. Elem,* 514 U.S. 765, 767–68, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995)("ultimate burden of persuasion rests with, and never shifts from, the opponent of the strike"); *Ford v. State,* 1 S.W.3d 691, 693 (Tex.Crim.App.1999)(". . . Texas jurisprudence holds that once the State proffers race-neutral explanations for its peremptory strikes, the burden is on the defendant to convince the trial court that the prosecution's reasons were not race-neutral. Thus, the burden of production shifts from the defendant in step one to the State in step two, but the burden of persuasion never shifts from the defendant").

### III.

■ Appellant claims the State's striking of Venireperson No. 38 on the ground that she was "born in Liberia" demonstrates discrimination based on her nationality. Appellant points to no other evidence in support of his argument that the State's strike was based on race, and appellant did not query the State further at trial regarding its stated reason. Given that appellant's argument was based solely on the country of the venireperson's birth and nothing more, he has failed in his burden of persuasion to establish race dis-

crimination based on ethnicity.[9] We hold the Court of Appeals did not err in concluding that there was "no evidence in the record that race was the reason for the State's strike" and holding the trial court's overruling of appellant's *Batson* challenge against Venireperson No. 38 was not clearly erroneous.[10]

The judgment of the Court of Appeals is affirmed.

MEYERS, J., filed a concurring opinion.

JOHNSON, J., filed a dissenting opinion.

MEYERS, J., filed this concurring opinion.

By nearly all accounts, the inquiry that ought to be the central concern during *voir dire* is whether the questioned venireperson can be fair and impartial. Judicial rhetoric to the contrary, peremptory challenges do not further this goal. Nor were they ever intended to. Moreover, *Batson* and its progeny, have made a further muck of things by transforming *voir dire* into a lengthy ordeal involving inquires into inappropriate questions of race and ethnicity that not only have nothing to do with impartiality, but will also become increasingly muddled in the face of our changing society.[1]

Justice Marshall did not have a lot of faith in *Batson's* ability to detect and eradicate racial discrimination in the use of peremptory challenges. He believed peremptory challenges should be abolished:

The decision today[, *Batson*,] will not end the racial discrimination that per-

---

9. Whether a *prima facie* case of discrimination was made here is of no moment, given that the trial court conducted a full *Batson* hearing, the State offered a "race neutral" reason for its strike, and the trial court ruled on the ultimate question of intentional discrimination. *Hernandez v. New York*, 500 U.S. 352, 359, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991)("Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot").

10. We recognize that we do not reach the question upon which we granted review in this case—whether the Court of Appeals erroneously held that "race may be a factor coexisting with a non-racial reason; however, race may not be a reason for the strike." This is because appellant's ground for review is based upon an assumption which the State argues is incorrect-the assumption being that race was a factor for the State's strike, as evidenced by the prosecutor's reference to the venireperson's birthplace. The State's argument, directed at this core assumption underlying appellant's ground for review, had to be addressed first.

1. In researching this issue, I was amazed by the number and variety of arguments advanced in support of abolishing peremptory challenges. Constitutional claims, statistical studies, historical and public policy arguments, have all been made. This opinion will touch on a couple of arguments that I have found thought-provoking, but these are by no means the only angles from which to consider this issue. The constitutionality of peremptory challenges is an issue worthy of considerable thought, although I was unable to devote the time and energy to it here. One commentator points out that even Chief Justice Burger at one point observed that peremptory challenges might not survive an equal protection analysis:

A clause that requires a minimum of "rationality" in government actions has no application to "an arbitrary and capricious right."

Albert W. Alschuler, *The Supreme Court and the Jury: Voir Dire, Peremptory Challenges, and the Review of Jury Verdicts*, 56 U. CHI. L.REV. 153, 202 (1989)(quoting *Batson*, 476 U.S. at 125, 106 S.Ct. 1712 (Burger, J., dissenting)). As further articulated by this commentator, "The Equal Protection clause says in essence, 'When the government treats people differently, it has to have a reason.' The peremptory challenge says in essence, 'No, it doesn't.' " *Id.* at 203.

emptories inject into the jury-selection process. That goal can be accomplished only by eliminating peremptory challenges entirely.... The inherent potential of peremptory challenges to distort the jury process by permitting the exclusion of jurors on racial grounds should ideally lead the Court to ban them entirely from the criminal justice system.

*Batson v. Kentucky,* 476 U.S. 79, 102–103, 107, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986)(Marshall, J., concurring). Time has proven Justice Marshall right, and today I register my agreement with the growing ranks of other jurists and commentators who have come to the same conclusion. *See Minetos v. City University of New York,* 925 F.Supp. 177, 183 & 185 (S.D.N.Y.1996)(stating that "all peremptory challenges should now be banned as an unnecessary waste of time and an obvious corruption of the judicial process" and holding that "peremptory challenges *per se* violate equal protection"); *Alen v. State,* 596 So.2d 1083, 1086 (Fla.Dist.Ct.App.1992)(Hubbart, J., concurring)("Rather than engage in a prolonged case-by-case strangulation of the peremptory challenge over a period of many years which in the end will effectively eviscerate the peremptory challenge or, at best, result in a convoluted and unpredictable system of jury selection enormously difficult to administer—I think the

time has come, as Mr. Justice Marshall has urged, to abolish the peremptory challenge as inherently discriminatory"), *app'd* 616 So.2d 452 (Fla.1993); *People v. Hernandez,* 75 N.Y.2d 350, 553 N.Y.S.2d 85, 552 N.E.2d 621, 625 (1990)(Titone, J., concurring)("... I suspect that rather than developing a complex set of judicially imposed limitations and standards, the most constructive course would be for the Legislature to take a hard look at the existing peremptory system with a view toward determining whether it is still viable"), *aff'd* 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991); Morris B. Hoffman, *Peremptory Challenges Should be Abolished: A Trial Judge's Perspective,* 64 U. Chi. L.Rev. 809, 819, 848 (1997).

I.

I had always assumed peremptory challenges were conceived as a necessary means to achieving an impartial jury. After all, the Supreme Court repeatedly refers to the indispensable function of peremptory challenges in this regard, and those assurances are echoed by most courts.[2] *J.E.B. v. Alabama,* 511 U.S. 127, 137, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994)(noting that only legitimate interest in exercise of peremptory challenge is in securing fair and impartial jury); *United States v. Martinez–Salazar,* 528 U.S. 304, 310, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000)("The peremptory challenge is part of our common-law heritage" and "[w]e

---

**2.** While at once espousing the invaluable service of peremptory challenges to ensuring a fair and impartial jury, the Supreme Court has unwaveringly maintained that peremptory challenges have no constitutional bearing and that the erroneous loss of a peremptory challenge is harmless. *See Ross v. Oklahoma,* 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988) (erroneous denial of defendant's challenge for cause resulting in loss of peremptory challenge in capital case did not violate constitutional right to impartial jury). This Court has previously observed that even discrimina-

tory use of peremptory challenges does not logically affect the impartiality of the resultant jury: "The possibility of racial prejudice in the selection of the petit jury affects the adversarial presentation of the case not at all ... if race is not an allowable 'proxy' for bias [citation omitted] we can only conclude that an all white jury-whether it is the product of chance or of racial discrimination in the exercise of peremptory challenges-can nevertheless render a fair and impartial verdict in the trial of a minority defendant." *Batiste v. State,* 888 S.W.2d 9, 15 (Tex.Crim.App.1994)

have long recognized the role of the peremptory challenge in reinforcing a defendant's right to trial by an impartial jury"); *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 620, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991)(sole purpose of peremptory challenge is to permit litigants to assist government in selection of impartial trier of fact); *see also United States v. Harbin*, 250 F.3d 532, 541 (7th Cir.2001) ("peremptory challenges are a significant means of achieving an impartial jury"). But there is really little logical or legal argument in support of the use of peremptory challenges as a means of securing an impartial jury. *See* n. 2, *supra.* Perhaps this is because the peremptory challenge was never historically conceived as a component of jury impartiality.

At the time the jury system began to take root in English law, somewhere between 1220 and 1270, peremptory challenges first appeared in capital cases in response to two conditions: the Crown handpicked all prospective jurors and the Crown could exercise an unlimited number of peremptory challenges. Morris B.

Hoffman, *Peremptory Challenges Should be Abolished: A Trial Judge's Perspective, supra* at 819 & 848. The Crown's unlimited peremptory challenges were really challenges for cause which, due to the Crown's royal infallibility, were indisputable. In other words, the Crown, by virtue of its being the Crown, did not have to articulate a reason for the strikes. *Id.* at 845. To off-set these advantages, by 1300, most courts awarded criminal defendants thirty-five peremptory challenges in capital cases (at that time, nearly all felonies were punishable by death). *Id.* at 820–21. In practice, however, English criminal defendants rarely used any peremptories.[3] Over the years, the number of peremptory challenges given criminal defendants steadily decreased-from thirty-five to twenty in 1530, to seven in 1948, to three in 1977, and finally, to their elimination in 1989. *Id.* at 822. The Crown's peremptory challenge rights were taken away in 1305, and any other ability to exclude jurors for reasons other than for cause was abolished in 1989.[4] Thus, as originally conceived in English common law, peremptory chal-

---

3. "Even in modern times, when perceived abuses eventually led to the complete abolition of the peremptory challenge in England, its use, as late as 1979, had been described as no more frequent than one in seven trials, rarely with more than one peremptory challenge in a case." Morris B. Hoffman, *Peremptory Challenges Should be Abolished: A Trial Judge's Perspective, supra* at 821; *see also* Albert W. Alschuler, *The Supreme Court and the Jury: Voir Dire, Peremptory Challenges, and the Review of Jury Verdicts, supra* at 165–66 (peremptory challenges were used so rarely in English history that some historians concluded they were unavailable). Peremptory challenges were abolished in England due to public perception that they were subject to abuse and corruption, despite the restrained use of them in English courts: "Perhaps nothing is more telling of the restrained manner in which the English have exercised the peremptory challenge than the fact that in the most publicized of these trials,

the Cyprus spy trial, all seven defendants pooled their peremptory challenges and exercised a grand total of seven." Morris B. Hoffman, *Peremptory Challenges Should be Abolished: A Trial Judge's Perspective, supra* at 822.

4. While Parliament outlawed the use of peremptory challenges by the Crown in 1305, the Crown circumvented this restriction by developing a procedure called "standing aside." By this practice, the Crown's prosecutors could ask any number of potential jurors to stand aside during the selection of the other jurors. Only if the number of jurors chosen were insufficient to constitute a jury after the parties exercised their challenges for cause, and the defendant exercised his peremptories, would those standing aside be recalled. Morris B. Hoffman, *Peremptory Challenges Should be Abolished: A Trial Judge's Perspective, supra* 821–22. The Crown's standing aside rights were abolished in 1989.

lenges had nothing to do with juror impartiality.[5] Nor do I think they have much to do with jury impartiality today.[6]

To the contrary, parties strategically utilize their peremptory challenges in an effort to select jurors that are as biased in their favor as possible. In order to eliminate jurors who are not likely to be biased in their favor and retain those who are, parties rely on group generalizations:[7]

5. It is also worth noting that juror impartiality was not a component of trials at the time peremptory challenges first appeared in the mid-thirteenth century. Morris B. Hoffman, *Peremptory Challenges Should be Abolished: A Trial Judge's Perspective, supra* at 846. English jurors at that time were still trial witnesses, selected *because of* their connection to or knowledge of the case. Rather, as explained above, peremptory challenges arose as a reaction to the excesses of the crown, and some argue that these beginnings render the challenge without valid purpose today:
> The fact that the peremptory challenge sprang to life as a corollary to the axiom of royal infallibility is terribly important ... The ideas that the peremptory challenge is decidedly undemocratic, that it is susceptible to significant abuse by authorities, and that it is inherently irrational, all flow directly from the fact that the peremptory challenge is actually the lost heir of the divine right of kings. Something is fundamentally wrong with a jury selection system in which a lawyer can excuse perfectly qualified and objectively impartial jurors without offering any explanation. The something that is fundamentally wrong is that lawyers are no more infallible than kings.... When we cogitate today about what exactly the peremptory challenge has to do with juror impartiality, we should not be ashamed to say 'nothing.'

*Id.* at 846–47; *see also* Nancy S. Marder, *Beyond Gender: Peremptory Challenges and the Roles of the Jury,* 73 TEX. L.REV. 1041, 1094 (1995)("[t]he peremptory, which was once a device to exclude loyalists to the Crown, has been transformed into a mechanism for excluding prospective jurors based upon stereotypes").

6. It's not altogether clear why the peremptory challenge has achieved such prominence in this country. Some believe the American experience is due in no small part to the years surrounding the abolition of slavery, civil war and the Reconstruction. Morris B. Hoffman, *Peremptory Challenges Should be Abolished: A Trial Judge's Perspective, supra* at 827–28. At the same time the peremptory challenge was fading from use in England, it was thriving in America as a means of excluding disfavored racial groups from jury service. And by all accounts, it was incredibly effective in this capacity. For instance, "When Mr. Swain, of Swain v. Alabama fame, was convicted by his all-white Talladaega County jury in the early 1960s, no black person had sat on any Talladega County trial jury, civil or criminal, in living memory." Morris B. Hoffman, *Peremptory Challenges Should be Abolished: A Trial Judge's Perspective, supra* at 829. Problems persist. Justice Marshall noted in *Batson* that "[i]n 100 felony trials in Dallas County in 1983–1984, prosecutors peremptorily struck 405 of 467 eligible black jurors; the chance of a qualified black sitting on a jury was 1 in 10, compared to 1 in 2 for a white." *Batson,* 476 U.S. at 104, 106 S.Ct. 1712 (Marshall, J., concurring)(citing Dallas Morning News (March 9, 1986)).

7. An extreme example of this approach to selecting jurors biased in favor of the State could be found in a pre-*Batson* prosecutors' manual:
> You are not looking for a fair juror, but rather a strong, biased and sometimes hypocritical individual ... You are not looking for any member of a minority group which may subject him to oppression-they almost always empathize with the accused.... Look for physical afflictions. These people usually sympathize with the accused.... I don't like women jurors because I can't trust them. They do, however, make the best jurors in cases involving crimes against children.... Extremely overweight people, especially women and young men, indicates a lack of self-discipline.... People from small towns and rural areas generally make good State's jurors. People from the east or west coasts often make bad jurors.... Intellectuals such as teachers, etc., generally are too liberal.... Hunters always make good State's jurors.... Jewish veniremen generally make poor State's jurors. Jews have a history of oppression and generally empath-

The good trial advocate starts with the proposition that the last thing he wants is a neutral, unbiased and unprejudiced jury. *He wants, of course, the most biased and prejudiced jury he can possibly come up with, provided it is biased and prejudiced his way.* This by no means suggests that the American criminal justice system does not seek neutral, unbiased and unprejudiced juries. It achieves the goal of an impartial jury, however, by the process of dynamic equilibrium. From the healthy clash of two skilled adversaries, each striving for the most partial jury obtainable in his direction, there emerges the synthesis of resultant impartiality.... As they engage in the educated guesswork of jury selection, each adversary tries to spot the probable prejudices coursing through the mainstream and the byways of American life—racial, religious, sexual, ethnic, educational, residential, economic, social—and then to maximize those running in his favor and to minimize those running against him.... The advocate recognizes, of course, that an individual member of a group does not necessarily share the group's characteristics but that there is nonetheless a more-than-random likelihood that that individual will. With available peremptory challenges, the trial advocate plays the law of averages.

*Chew,* 527 A.2d at 345 (emphasis added); *see also* Nancy S. Marder, *Beyond Gender: Peremptory Challenges and the Roles of the Jury, supra* at 1093 ("[lawyers] have transformed jury selection from an exercise in selecting an impartial jury to an exercise in selecting a favorable jury ..."); Albert W. Alschuler, *The Supreme Court and the Jury: Voir Dire, Peremptory Challenges, and the Review of Jury Verdicts, supra* at 203 ("[t]rial lawyers frequently observe that they use peremptory challenges, not to secure impartial juries, but to secure juries likely to favor their positions"). But while parties are utilizing their peremptory challenges as a vehicle for engaging in discrimination of every kind and against every conceivable group, group membership is becoming harder to identify.

## II.

Which brings us to another problem—that of group identification and classifying persons within groups. The majority's holding that " 'race,' for purposes of *Batson*, encompasses notions of ancestral line and ethnicity" is correct. *Majority opinion* at 857. And I agree that using peremptory strikes against a person solely on account of that person's ethnicity is a violation of equal protection. But defining a cognizable racial/ethnic group or determining what racial/ethnic group a particular venireperson falls within may become such an ordeal as to be either absurd or nearly impossible. For example, the following discussion gives some hint of the types of problems associated with identifying a venireperson as "Hispanic" and with defining Hispanics as a cognizable group:

Acknowledging that the group they seek to identify shares no religious or physical characteristics, the majority bases its

---

ize with the accused. Lutherans and Church of Christ veniremen usually make good State's jurors.

Albert W. Alschuler, *The Supreme Court and the Jury: Voir Dire, Peremptory Challenges, and the Review of Jury Verdicts, supra* at 210–11 (quoting from same prosecutors' manual from which portions were quoted by Justice Marshall in his concurring opinion in *Batson*). Reliance on such stereotypes has not been confined to the State's side of the bar. Defense attorneys are just as likely to engage in the same kinds of stereotypical assumptions. It is highly unlikely, however, that since *Batson,* any adversary has transcribed such views to writing.

identification of "Hispanics" into ancestral characteristics, "often typified by surname," and language, "the common language being Spanish." There are major problems in transporting this definition into actual application

... In 1950 and 1960, the United States Census Bureau used a Spanish surname standard [but][b]ecause of the inaccuracies in such a measure, the Census Bureau dropped that standard....

> [According to a Census Bureau study,] one-third of those who claim Hispanic origin do not have a Spanish-language surname. Furthermore, one-third of those who have Spanish-language surnames do not consider themselves Hispanics. The surname approach has an additional result of failing to account for "Hispanics" who either through marriage or adoption obtain an English surname. Similarly, surname classifications fail to consider "Hispanics" whose surnames are not commonly considered Spanish, whose surnames are a result of varied European ancestry, whose surnames have been Anglicized, or whose surnames are derived from other than Castillian Spain....

The surname approach would also lead to classifying as "Hispanic" others who share the surnames and the language. Until 1968 and 1976, respectively, Spain governed Equatorial Guinea and Morocco, as well as other African settlements of Rio de Oro and Ifni. Although not the intended result, Africans from these settlements would be engulfed by this category....

Conversely, many "Hispanics" do not speak Spanish. Many who do, speak variations of the language.... Many descendants of Spanish-speaking immigrants, no longer know how to speak Spanish. This lack of language would then deprive them of the protection of the cognizable class, while admitting questionable others.... Finally the majority refers to a common "native language being Spanish." However, with few exceptions, each of the countries from which today's "Hispanics" are derived, including Spain, were originally inhabited by indigenous tribes. The language of these indigenous tribes, is their "native language."

... The term "Hispanic" is far from being an accepted classification.... [T]he use of the term "Hispanic" is a governmentally contrived term:

> "Hispanic" as an ethnic label is the product of a decision by the Office of Management and Budget (OMB) in 1978 to operationalize the label as "A person of Mexican, Perto Rican, Cuban, Central or South American or other Spanish culture of origin, regardless of race.

The OMB definition creates further applicational problems. By including South Americans, that definition also includes residents and descendants of Belize, Brazil, British and French Guayana. By including "other Spanish culture or origin," it includes Filipinos, and all other Spanish colonies, including those in Africa. In practice, the OMB definition does not include Spain, nor Spanish colonies in other continents, although Spaniards and their descendants are certainly of "Spanish culture or origin."

Another common label used to define this group is that of "Latins" or "Latinos". Without a doubt the label of "Latins" raises as many problems as "Hispanics." ... *The problem is not the label attached to the group.... The problem is that if the United States government, accomplished authors, statisticians, linguists, etc. have been unable to define what is a "Hispanic,"*

*with some precision and clarity, how is a trial judge to determine which juror can be stricken and which is protected?*

*Alen,* 596 So.2d at 1093–1095 (Gersten, J., concurring) (citations omitted)(emphasis added); *see also Mejia v. State,* 90 Md. App. 31, 599 A.2d 1207, 1213(accepting the appellant's definition of "Hispanic" but referring to it as a "candidly amorphous and imprecise definition"), *vacated,* 328 Md. 522, 616 A.2d 356 (1992). Another court viewed the prospect of making ethnic assessments particularly distasteful and inappropriate:

" . . . we would be reduced, as rank ethnological amateurs, to playing guessing games based upon surnames, even as trial counsel and the trial judge, had they chosen to indulge, would have been reduced to such rankly amateurish speculation . . . If required to engage in such a game, however, one might conclude that the prosecution struck one woman, Ms. LaGrange, whose surname (or husband's surname) suggests a possible French, French Canadian, or Cajun background; one man, Mr. Pakkianathan, whose surname suggests a possible Pakistani or Indian background; a second man, Mr. Estrada, whose surname suggests a possible European Spanish, European Portuguese, Hispanic, Brazilian, or Filipino background; and a third man, Mr. Lehman, whose surname suggests a possible German Jewish background. If *Batson v. Kentucky* were allowed to run amok, the prosecutor might be called upon, we suggest, to give a racially neutral, ethnically neutral, religiously neutral, and gender neutral explanation for any or all of these merely arguable possibilities."

*Mejia,* 599 A.2d at 1212–13. The problem is compounded by the fact that while *Batson*'s application will logically extend to virtually any identifiable group, at the same time, the make-up of our society is rapidly changing. People can no longer be classified as falling within identifiable groups of black or white. *See id.* at 1208 (moving from "bi-polar world of black and white into subtler grays," it becomes, as some predicted from the beginning, increasingly apparent that, at worst, we are irreversibly adrift on a slippery slope with no foreseeable stopping place short of the elimination of the peremptory challenge. At best, we are sentenced to at least a decade of playing a diverting ethnological parlor game called "Who is What and How Do We Know It?"); *Alen,* 596 So.2d at 1087 (Hubbart, J., concurring)(noting that in Dade County alone there are "many cognizable minority ethnic groups besides Hispanics: including Anglo Americans, Jewish Americans, native Americans, Arab Americans, and other European Americans" and observing that our country is a nation of immigrants, with the exception of the American Indian, and therefore "all Americans belong to some minority, ethnic/national origin group . . . .").

### III.

A final point that I would be remiss in failing to mention is the utter inability of *Batson* and its progeny to deal with the ease by which discriminatory intent may be masked in a "racially neutral explanation" and the virtually impossible task of uncovering pretext.

We are by now familiar with *Batson's* three step test required to prove race discrimination in the exercise of a peremptory challenge: (1) the opponent of a peremptory challenge must make out a prima facie case of racial discrimination; (2) the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation for the strike; and (3) the trial court must then decide whether the opponent of the strike has proved purposeful racial discrimination. Explaining

step two, the Court in *Batson* stated that the prosecutor "must articulate a neutral explanation related to the particular case to be tried" and give a "clear and reasonably specific" explanation of his "legitimate reasons for exercising the challenges." *Batson,* 476 U.S. at 98 & n. 20, 106 S.Ct. 1712. But further expounding on step two in *Purkett v. Elem,* the Court said a prosecutor is not required to articulate "an explanation that is persuasive, *or even plausible.*" 514 U.S. 765, 768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995)(emphasis added). What it had meant, the Court explained, by a "legitimate reason" was "not a reason that makes sense, but a reason that does not deny equal protection."[8] *Id.* at 769, 115 S.Ct. 1769. But if a prosecutor's explanation for a peremptory strike does not have to make sense or even be plausible, how are trial courts to assess pretext? With great difficulty. To say that courts'

attempts at applying *Batson,* and in particular, at assessing the existence of pretext, are "all over the map" is an understatement.[9] *See Minetos,* 925 F.Supp. at 183–84 & n. 6.

## IV.

*Batson* claims will inevitably grow in number, compelling hour upon hour of inquiry into venirepersons' ethnic backgrounds and heritage and further inquiry into the supposed thoughts and impulses of the proponent of the strike, issues that are irrelevant to juror impartiality. Moreover, peremptory challenges do not further the goal of an impartial jury, there is no historical rationale supporting their continued use and there is no constitutional right to them. The continued viability of peremptory challenges is not before this Court today. But I would urge the legislature to take a serious look at this issue.[10] With

---

8. Justices Stevens and Breyer viewed *Purkett*'s articulation of step two such a departure from the standard set out in *Batson* as to overrule that portion of *Batson.* *Id.* at 770, 115 S.Ct. 1769 (Stevens, J., dissenting, joined by Breyer, J.).

9. In one demonstrative effort to deal with the problem, New York appellate judges drafted some guidelines to assist trial courts in applying *Batson*'s second step. *Minetos,* 925 F.Supp. at 184. The guidelines listed certain reasons for striking jurors that could be presumed pretextual and other reasons that could be presumed as not pretextual. *Id.* But, as noted by a New York federal district court, "[o]f course, listing in this manner has the unfortunate effect of creating a how-to guide for defeating Batson challenges. Such guidelines do not ensure that juror strikes are not racially motivated—only that advocates are on notice of which reasons will best survive judicial review." *Id.* at 184–85; *see also* Nancy S. Marder, *Beyond Gender: Peremptory Challenges and the Roles of the Jury, supra* at 1122 ("over time parties learn which reasons are acceptable and which are not and simply adjust their reasons accordingly, without necessarily abandoning the underlying stereo-

types that might actually motivate the peremptory").

10. Some thinkers on this issue have suggested that elimination of peremptory challenges may call for some other modification to the system. The most commonly mentioned remedies are to make some expansion on challenges for cause, and/or requiring a less than unanimous verdict. *See Alen,* 596 So.2d at 1090 (Hubbart, J., concurring)(suggesting that "traditional grounds for a challenge for cause [could be expanded] so as to include any sound, strategic, nondiscriminatory reason why trial counsel might doubt a juror's impartiality or capacity to perform as a juror"); Albert W. Alschuler, *The Supreme Court and the Jury: Voir Dire, Peremptory Challenges, and the Review of Jury Verdicts, supra* at 207 (challenges for cause might be allowed where, even without a finding of partiality, a juror's ability or fairness nonetheless appeared in doubt, and Supreme Court has upheld the constitutionality of non-unanimous jury verdicts in state criminal cases—a procedure that denies idiosyncratic jurors the ability to frustrate the judgments of others.); Nancy S. Marder, *Beyond Gender: Peremptory Challenges and the Roles of the Jury, supra* at

these comments, I join the opinion of the Court.

JOHNSON, J., filed a dissenting opinion.

I respectfully dissent. The majority opinion affirms the court of appeals on the basis that appellant "failed in his burden of persuasion to establish race discrimination based on ethnicity." *Ante*, at 859. In doing so, the majority decides an issue that is in no way related to the ground for review that was granted by this court.

On appeal, appellant contended, *inter alia*, that the state's decision to use a peremptory challenge to strike venire member No. 38 was in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The state stated that it struck this venire member because she was unemployed, born in Liberia, and spoke more during appellant's voir dire examination. After holding that unemployment was a valid, race-neutral reason, and not a pretext for discrimination, the court of appeals went on to consider appellant's claim that a strike based on the venire member's national origin was prohibited by *Batson*. *Wamget v. State*, No. 14–96–001188 CR, 1999 WL 672327, at *4 (Tex.App.—Houston [14th Dist.] August 31, 1999) (not designated for publication), 1999 Tex.App. LEXIS 6540, at *11. When such a claim is made, the objecting party must first make a prima facie showing that the other party has used a peremptory challenge to remove a member of the venire on account of race. *Purkett v. Elem*, 514 U.S. 765, 767, 115 S.Ct. 1769, 1770, 131 L.Ed.2d 834 (1995). Once such a showing

has been made, the burden of production shifts to the other party to come forward with a race-neutral explanation. *Id.* If a race-neutral explanation is proffered, then the trial court must then decide whether the objecting party has proven purposeful discrimination. *Id.* at 767, 115 S.Ct. at 1770–1.

The court of appeals found that under our decision in *Hill v. State*, 827 S.W.2d 860, 866 (Tex.Crim.App.) (plurality opinion), cert. denied, 506 U.S. 905, 113 S.Ct. 297, 121 L.Ed.2d 221 (1992), race may be a factor co-existing with a non-racial reason, but that it may not be the reason for the strike. *Id.* at *4, 1999 Tex.App. LEXIS 6540, at *11–*12. The court thus held that "because there was no evidence in the record that race was the reason for the State's strike," it could not say that the trial court's decision to overrule appellant's Batson challenge regarding venire member No. 38 was clearly erroneous. *Id.* at *4, 1999 Tex.App. LEXIS 6540, at *12. We granted appellant's petition for discretionary review to determine whether the court of appeals erroneously held that "race may be a factor co-existing with a non-racial reason; however race may not be a reason for the strike."

Thus, the question presented by appellant's ground for review is whether a Batson violation occurred when race is given as one of the reasons for a peremptory strike, but not the only reason. Prior to Hill, several intermediate court decisions adhered to the so-called "taint" approach, i.e., if race is a factor in a peremptory strike, then a Batson violation has been proven. See *Moore v. State*, 811 S.W.2d

1103 (discussing expansion of challenge for cause grounds in event peremptory challenges were eliminated); Gordon Van Kessel, *Adversary Excesses in the American Criminal Trial*, 67 Notre Dame L.Rev. 403, 537–38 (1992) (elimination of peremptory challenge might

require some reform such as relaxation of traditional unanimous verdict requirement—following English example, we could require ten to two verdict after two hours of deliberation).

197, 200 (Tex.App.—Houston [1st Dist.] 1991, pet. ref'd); *McKinney v. State*, 761 S.W.2d 549 (Tex.App.—Corpus Christi 1988, no pet.); *Speaker v. State*, 740 S.W.2d 486 (Tex.App.—Houston [1st Dist.] 1987, no pet.). Hill itself provides little, if any, precedential value. Judge Maloney's "lead" opinion adhered to the so-called "dual motivation" approach i.e., that race may be a factor coexisting with a non-racial reason for a strike, but that it may not be the reason for the strike. *Hill*, 827 S.W.2d at 866–9 (plurality opinion). However, just three other members of the court joined that opinion. Judge Baird's concurring opinion, also joined by three other judges, adopted the "taint" approach. *Hill*, 827 S.W.2d at 870–5 (Baird, J., joined by Clinton, Overstreet, and Benavides, JJ., concurring). Judge Miller concurred only in the result, without an opinion.

The split of this court in Hill reflects the split on this issue found around the country. A number of federal courts have adopted the "dual motivation" approach: if the party exercising the peremptory challenge acknowledges that a discriminatory reason was a factor, along with other legitimate factors, for excluding a juror, then the party challenging the use of the peremptory challenges has made a prima facie showing of discrimination, and the opposing party has the burden of showing that the legitimate reasons given are not pretextual, i.e., that even without the improper motivation, it would still have struck the juror. See, e.g., *United States v. Tokars*, 95 F.3d 1520, 1531–34 (11th Cir.1996), cert. denied, 520 U.S. 1132, 117 S.Ct. 1282, 137 L.Ed.2d 357 & 520 U.S. 1151, 117 S.Ct.

1328, 137 L.Ed.2d 489 (1997); *Wallace v. Morrison*, 87 F.3d 1271, 1273–5 (11th Cir. 1996), cert. denied, 519 U.S. 1044, 117 S.Ct. 616, 136 L.Ed.2d 540 (1996); *United States v. Darden*, 70 F.3d 1507, 1531–2 (8th Cir.1995), cert. denied, 517 U.S. 1149, 116 S.Ct. 1449, 134 L.Ed.2d 569 (1996), & 518 U.S. 1026, 116 S.Ct. 2567, 135 L.Ed.2d 1084 (1996); *Holder v. Welborn*, 60 F.3d 383, 389–90 (7th Cir.1995); *Jones v. Plaster*, 57 F.3d 417, 420–22 (4th Cir.1995); *Howard v. Senkowski*, 986 F.2d 24, 30 (2nd Cir.1993); *United States v. Alcantar*, 897 F.2d 436, 440 (9th Cir.1990).

However, a number of state courts have rejected this approach, and have taken the "taint" view that a discriminatory reason, even if given in combination with other, legitimate, reasons, taints the entire jury proceedings, and so requires a reversal. See, e.g., *State v. Lucas*, 199 Ariz. 366, 18 P.3d 160, 163 (App. Div. 1 2001); *Payton v. Kearse*, 329 S.C. 51, 495 S.E.2d 205, 209–10 (1998); *State v. Haigler*, 334 S.C. 623, 515 S.E.2d 88, 92 (1999); *McCray v. State*, 738 So.2d 911, 914 (Ala.Crim.App.1998), *Rector v. State*, 213 Ga.App. 450, 444 S.E.2d 862, 863–5 (1994). At least one court of military review has adopted this approach. *United States v. Greene*, 36 M.J. 274, 282 (CMA 1993). The Texas Supreme Court also appears to have adopted this approach. *See Powers v. Palacios*, 813 S.W.2d 489, 490–1 & n. 1 (Tex. 1991).

The majority opinion in the instant case does not answer the ground granted for review: does the "taint" view or the "dual motivation" view prevail in Texas criminal jurisprudence?[1] Thus, the issue decided

---

**1.** It instead "address[es] the question of whether it was established that 'race' was even a factor underlying the peremptory strike," and decides that appellant did not meet his burden of persuasion required under the first step of *Batson* and *Purkett*, i.e., he did not make a prima facie case of ethnicity. *Ante*, at 852 & 857. Clearly, the court of appeals found otherwise, since it cited *Hill* for the proposition that "race may be a factor coexisting with a non-racial reason," and overruled appellant's point of error on that basis.

by the majority today is not encompassed within the granted ground for review and so is not properly before us. Moreover, this case does not present the question of "whether the country of one's birth place is sufficient grounds on which to establish a person's ethnicity for making a *Batson* claim based on ethnicity." *Ante,* at 858. Because the court of appeals' decision in no way encompasses this issue, we have no jurisdiction to make such a determination. *See Garcia v. State,* 15 S.W.3d 533, 536–37 n. 5 (Tex.Crim.App.2000) (jurisdiction of Court of Criminal Appeals is limited to review of decisions by the courts of appeals); *see also* TEX.CODE CRIM. PROC. art. 4.04, § 2; TEX.R.APP. P. 66.1. The court's concern regarding the distinction between race/ethnicity and place of birth may well be reason to dismiss this petition as improvidently granted or to remand for consideration of that issue, but it provides no reason to affirm the court of appeals.

Nevertheless, because the court holds as it does, I feel it necessary to examine its determination that race/ethnicity and place of birth do not substantially overlap in the instant case (and in many other cases of alleged racial bias). While it is true, as a general proposition, that race/ethnicity may be distinguished from place of birth, for the majority of the countries of the world, place of birth is a strong indicator of ethnicity. Given Liberia's location (West Africa), history (a republic founded in 1821 by freed American slaves), and its original goal (to repatriate former slaves to the home of their ancestors), there is cer-

tainly a great deal of overlap between race/ethnicity and place of birth here. Furthermore, if place of birth and ethnicity do overlap here and venire member No. 38 is of African descent, that fact was very probably obvious to all parties. The majority's refusal to recognize this probable overlap makes its decision all the more troublesome.

I dissent.

*Wamget,* 1999 WL 672327, at *4, 1999 Tex.App. LEXIS 6540, at * 11–12. The majority's attempt to bolster its holding through the court of appeals' quote that "there is no evidence in the record that race was the reason for the strike" (*ante,* at 859) distorts that sentence by taking it out of context. Given the cite to *Hill* in the court of appeals' opinion, as well as its previous determination that the other reasons offered by the state for excluding venire member No. 38 were race-neutral and not pretextual, the court of appeals was certainly saying that "there is no evidence in the record that race was *the* reason for the strike."